## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Special Agent Andrew Frigon, Drug Enforcement Administration, being duly sworn, depose and state as follows:

### Agent Background

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since March 2017.  I am currently assigned to the Portsmouth New Hampshire Tactical Diversion Squad.  Prior to my current assignment, I was assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including the Federal Bureau of Investigation ("FBI"), DEA, Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.  My primary duties at the DEA include the investigation of organized drug trafficking organizations ("DTOs").  I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

2.      Prior to becoming a DEA Special Agent, I was employed by the New Hampshire Department of Safety, Division of State Police as a State Trooper, and was so employed from August 2012 to November 2016.  I hold a Bachelor of Science Degree in Criminal Justice from Worcester State University.

3.      As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.  I have received training regarding narcotics investigations while attending the Basic Agent

Academy in Quantico, Virginia, and have attended additional specialized training courses in furtherance of my past and current assignments.

4.     I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, and to protect their operations, members, narcotics, and narcotics proceeds.

5.     Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

6.      Based on my training and experience, I am familiar with narcotics traffickers'
methods of operation, including methods used by them to distribute, store and transport narcotics
and to collect, expend, account for, transport, and launder drug proceeds.

7.      Based on my training and experience, I am familiar with the methods of operation
employed by drug traffickers operating at the local, statewide, national, and international levels,
including those involving the distribution, storage, and transportation of controlled substances and
the collection of money that constitutes the proceeds of drug-trafficking activities.  Specifically, I
am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and
private delivery services, and a variety of other means to transport and distribute narcotics and the
proceeds of narcotics trafficking.  I am familiar with the manner in which drug traffickers often
store drugs and drug proceeds in their residences and in storage sites commonly referred to as
"stash houses."

**<u>Purposes of the Affidavit</u>**

8.      I submit this affidavit in support of an application for a criminal complaint charging
the following individuals (the "Target Subjects") with conspiracy to distribute and to possess with
intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846
(the "Charged Offense").

       a. Ernesto   Arberty   Mendez   Herrera,   a/k/a   "Chachi"   ("MENDEZ
           HERRERA");

       b. Ricky Junior Rodriguez Reynoso ("REYNOSO");

       c. Cristofel Baez Guerrero ("BAEZ GUERRERO");

       d. Luis Castillo ("CASTILLO");

       e. Yomerli Mendez Arias ("ARIAS");

    f.   Estarling Perez Almonte ("ALMONTE");

    g.   Raidyn Hernandez Montero ("MONTERO");

    i.   Ricardo Canela Soto ("CANELA SOTO"); and

    j.   Waldo Lara Arias ("LARA ARIAS").

Based on the facts set forth in this affidavit, there is probable cause to believe that the Target Subjects have committed the Charged Offense.

9.    I also submit this affidavit in support of applications for search warrants for the following premises and the cellular phones located therein for fruits and instrumentalities of the Charged Offense, described more fully in Attachment B:

    a.   <u>Target Location 1</u>: 45 Oakwood Avenue, First Floor Apartment, Lawrence, Massachusetts. Target Location 1 is further described in Attachment A-1.

    b.   <u>Target Location 2</u>: 51 Wilcock Street, Apartment 2, Boston, Massachusetts 02124.  Target Location 2 is further described in Attachment A-2.

10.    As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint and warrants.  Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

## Probable Cause

### *Investigation Background*

11.     Since early 2023, investigators have been working with a cooperating witness (the "CW") to identify and investigate drug trafficking targets with whom the CW was familiar based on the CW's prior experience as a drug trafficker.[1]  The CW informed investigators that the CW received fentanyl directly from a source of supply in Mexico.

12.     The CW has identified several other drug trafficking targets, including MENDEZ HERRERA.  With authorization of supervising investigators, throughout this investigation, the CW and MENDEZ HERRERA remained in regular communication and frequently discussed MENDEZ HERRERA's ongoing drug trafficking activities.  Because MENDEZ HERRERA appeared to trust the CW as a fellow drug trafficker, MENDEZ HERRERA often shared specific details about his trafficking, including his plans to travel to retrieve and/or deliver drugs, described in greater detail below.

13.     Through the CW's communications with MENDEZ HERRERA, since November 2023, investigators have identified the above Target Subjects and others involved in MENDEZ HERRERA's drug-trafficking organization ("DTO").  MENDEZ HERRERA has explained to the CW that his DTO transports narcotics from Massachusetts to various locations in Maine, distributes the drugs from those locations, and returns the narcotics proceeds to locations in

---

[1] The CW was arrested and charged after investigators observed the CW arrange for and distribute large quantities of fentanyl.  The CW is now cooperating with investigators in the hopes that the CW will receive a lower sentence for charges resulting from that investigation. Other than the CW's criminal activities leading to the CW's pending charges, the CW has no additional criminal history.  Investigators have worked with CW, proactively, to investigate additional narcotics traffickers as described in this affidavit and the CW's information has been corroborated to the extent possible.  The CW has provided information that has led to the identification of drug traffickers and the seizure of narcotics, firearms, and drug proceeds.  Investigators believe CW to be reliable.  The CW is in a position to testify.

Massachusetts.  Using court-authorized location data from the Target Subjects' cellular phones, court-authorized GPS trackers on DTO vehicles, toll records, pen registers and trap and trace orders, physical and video surveillance, investigators have seized narcotics and identified locations used to store and distribute narcotics and store narcotics proceeds, including Target Locations 1 and 2.

*The Target Subjects*

14.     MENDEZ HERRERA frequently communicates with the CW regarding his drug-trafficking activities in Maine and Massachusetts.  On October 11, 2023, investigators seized suspected fentanyl from MENDEZ HERRERA and REYNOSO as they drove north to Maine. MENDEZ HERRERA drove back and forth from Massachusetts to Maine numerous times throughout the investigation.  On August 21, 2024, MENDEZ HERRERA coordinated for ⬛⬛⬛⬛⬛ to transport cocaine and methamphetamine to Maine.  Investigators seized the drugs and two firearms from ⬛⬛⬛⬛  On August 29, 2024, MENDEZ HERRERA coordinated for CANELA SOTO to transport a kilogram of sham fentanyl from the CW to Maine.

15.     REYNOSO frequently transports narcotics to Maine and narcotics proceeds to Massachusetts.  On October 11, 2023, investigators seized suspected fentanyl from REYNOSO and MENDEZ HERRERA as they drove north to Maine.  On September 12, 2024, investigators seized a mixture of fentanyl and cocaine from REYNOSO and LARA DIAZ during a motor vehicle stop.

16.     BAEZ GUERRERO frequently transports narcotics to Maine and distributes narcotics out of his residence, Target Location 2.  On February 26, 2024, investigators seized over one kilogram of fentanyl from BAEZ GUERRERO and CASTILLO during a motor vehicle stop. Investigators have observed BAEZ GUERRERO travel to known drug stash locations in

6

Massachusetts and Maine numerous times.  In September and October 2024, BAEZ GUERRERO arranged for the sale of suspected fentanyl from his residence, Target Location 2.

17.     CASTILLO is also an active member of this DTO, who frequently transports narcotics to Maine.   On February 26, 2024, investigators seized over one kilogram of fentanyl from CASTILLO and BAEZ GUERRERO during a motor vehicle stop.  On June 3, 2024, CASTILLO carried suspected narcotics into a known drug stash location in Malden.  On June 5, 2024, investigators seized fentanyl from CASTILLO and MONTERO during a motor vehicle stop.  On August 12-13, 2024, CASTILLO transported $1,000 in suspected narcotics proceeds from Maine to Massachusetts.

18.     ARIAS is an active member of this DTO and a regular transporter of narcotics and narcotics proceeds between Massachusetts and Maine.   On May 30, 2024, investigators seized methamphetamine, cocaine, and fentanyl from ARIAS and ALMONTE after they departed a known stash location and drove north towards Maine.   On June 11, 2024, investigators observed ARIAS meet with a drug customer near a known stash location to conduct a suspected drug transaction.  On August 20, 2024, ARIAS met with REYNOSO at Target Location 1 to accept suspected narcotics proceeds after REYNOSO returned from Maine.

19.     ALMONTE regularly travels to known stash locations operated by this DTO.   On May 30, 2024, investigators seized methamphetamine, cocaine, and fentanyl from ALMONTE and ARIAS after they departed a known stash location and drove north towards Maine.  On July 15, 2024, after CASTILLO loaded a vehicle at a known stash location, ALMONTE drove the vehicle to Maine to traffic drugs.

20.     MONTERO regularly travels back and forth to Maine for the purpose of trafficking drugs.  On June 5, 2024, investigators seized fentanyl from MONTERO and CASTILLO during a

motor vehicle stop.  On July 8, 2024, MONTERO and CASTILLO traveled from a known stash location in Massachusetts to known distribution locations in Maine.  On July 14, 2024, MONTERO and CASTILLO returned to Massachusetts from Maine.

22.     <u>CANELA SOTO</u> regularly travels back and forth to Maine for the purpose of trafficking drugs.  On August 29, 2024, CANELA SOTO transported one kilogram of sham fentanyl for the CW from Massachusetts to Maine and provided the kilogram to an undercover officer.

23.     <u>LARA ARIAS</u> is a courier for the DTO.  On September 12, 2024, investigators seized a mixture of fentanyl and cocaine from LARA DIAZ and REYNOSO during a motor vehicle stop.

*On October 11, 2023, Investigators Seized Suspected Fentanyl (Purple)*
*from MENDEZ HERRERA and REYNOSO after They Departed*
*from the Area of 500 Broadway, Malden Massachusetts in a Rented Vehicle.*

24.     On October 10, 2023, the CW informed investigators that the CW had received information from MENDEZ HERRERA about his plans for the following day (October 11, 2023).  MENDEZ HERRERA explained to the CW that he planned to leave his home, travel to meet an associate, obtain a rental car, pick up an unspecified quantity of narcotics, and then travel to Maine to distribute the narcotics.  This call was not recorded.

25.    Based on the CW's prior criminal and personal experience with MENDEZ HERRERA, the CW informed investigators that MENDEZ HERRERA's address as 779 Columbia Road, Dorchester, Massachusetts.  The CW informed investigators that MENDEZ HERRERA would most likely be driving a Jeep Grand Cherokee, bearing Massachusetts registration 3ALP21. Investigators determined that his vehicle was registered to the address of 779 Columbia Road, Apartment 1, Dorchester.  The CW further told investigators that MENDEZ HERRERA would most likely be leaving the above address at approximately 11:00 a.m. to begin his travels the following day.

26.    On October 11, 2023, at approximately 10:00 a.m., investigators established surveillance in the area of 779 Columbia Road in Dorchester.  Investigators were unable to locate the Jeep Grand Cherokee anywhere in the area.

27.    At the direction of investigators, the CW contacted MENDEZ HERRERA to determine his current location. At approximately 11:52 a.m., MENDEZ HERRERA, who was utilizing the WhatsApp messaging application assigned to telephone number 857-302-8456 (the "8456 Phone"), sent CW his location, revealing that MENDEZ HERRERA was within the area of 500 Broadway in Malden, Massachusetts ("500 Broadway").  Investigators traveled to this location and located the Jeep Grand Cherokee bearing Massachusetts registration 3ALP21 (the "Jeep") parked in the parking lot of 500 Broadway.  The address of 500 Broadway is the Strata Apartment Complex.

28.    At approximately 12:54 p.m., investigators observed MENDEZ HERRERA (whom officers recognized based on reviewing photographs previously shared with them by the CW) sitting in the driver seat of the Jeep.  The driver's door was ajar, and MENDEZ HERRERA appeared to have his head down looking at a cell phone in his hand.

9

29.     At approximately 1:23 p.m., investigators observed a Gray Toyota Tacoma, bearing Massachusetts registration 3RTZ13, registered to Expressway Motors Inc., 700 Morrissey Boulevard Dorchester, Massachusetts (the "Toyota") in the same parking lot.   Investigators observed MENDEZ HERRERA exit the Jeep and get into the Toyota's front passenger seat.  The Toyota backed up to the Jeep, and after a moment, MENDEZ HERRERA exited the Toyota and returned to the Jeep.  The Toyota then drove near the front door of the apartment complex and parked.  MENDEZ HERRERA returned to the Toyota and investigators observed the Toyota drive away from the parking lot outside 500 Broadway.

30.     Investigators were able to maintain surveillance of the Toyota and followed the vehicle as it stopped briefly at a Chipotle restaurant in Saugus and then a gas station in Peabody.  During these stops, investigators were able to observe the second occupant of the Toyota, a man later identified as REYNOSO.

31.     After leaving the gas station, investigators followed the Toyota as it traveled north on Route 1.  Investigators observed that the Toyota traveled primarily in the second-most left lane at a consistent speed of about 65 miles per hour, despite the fact that numerous vehicles were observed passing the Toyota in both the left and right lanes around the Toyota.  Investigators believed the Toyota may have been driving with extreme prudence to avoid attracting any law enforcement attention as they transported contraband.

32.     Investigators communicated with the New Hampshire State Police ("NHSP"), relayed their observations, and requested their assistance with a motor vehicle stop of the Toyota.  As the Toyota traveled just north of the Hampton Tolls along Interstate 95 in New Hampshire, NHSP initiated a traffic stop of the Toyota.  During this stop, the driver produced a Dominican

10

driver's license identifying himself as MENDEZ HERRERA and the passenger was identified as REYNOSO.

33.     REYNOSO produced the registration for the Toyota, showing that it was registered to Expressway Motors, a rental car company.  Investigators requested the rental agreement.  REYNOSO produced the rental agreement showing that the vehicle had been rented by a "Nicole," who was not with the vehicle.  Based on their training and experience, investigators know that vehicles rented by third parties can often be used in criminal activity because the occupants of the vehicle are not officially associated with the vehicle.  Investigators are also aware that drug traffickers often use third-party rental vehicles to transport narcotics.

34.     NHSP asked both men to step out of the vehicle.  While MENDEZ HERRERA was compliant, and was pat-frisked with negative results, REYNOSO began acting strangely.  When the trooper asked to pat-frisk REYNOSO, he immediately said "no" and began walking away.  The trooper placed REYNOSO against the NHSP vehicle and REYNOSO began exhibiting what, in the trooper's training and experience, he believed to be signs of fight or flight response.  REYNOSO stretched out and let out an audible yell, which triggered the trooper to decide to place REYNOSO in handcuffs to calm the situation.  As the trooper attempted to place REYNOSO in handcuffs, he began walking toward the woods, away from the trooper.  The trooper and his backup attempted to control REYNOSO but he continued to struggle and resist the troopers.  REYNOSO slipped out of the sweatshirt he was wearing and began running away from the troopers in the breakdown lane alone I-95.  Based on REYNOSO's flight along the highway, the Trooper deployed his taser to stop REYNOSO (after twice warning REYNOSO about his intent) and was eventually able to place REYNOSO in handcuffs without further incident.  NHSP called for an ambulance to transport REYNOSO for evaluation and searched REYNOSO incident to his arrest.

11

On REYNOSO's person, NHSP located three bags of what appeared to be distribution-levels of narcotics, including one bag containing a white chunky substance consistent with crack cocaine, one bag containing white powder consistent with cocaine, and one bag containing a purple-colored chunk which investigators suspected contained fentanyl.   The suspected controlled substances were sent to the laboratory for testing and the results are pending.   Based on all of the information above, and the appearance of the substances, investigators believe that all three bags contain controlled substances, and that REYNOSO and MENDEZ HERRERA were in fact transporting those drugs from Massachusetts to Maine as MENDEZ HERRERA had explained to the CW.

35.     Troopers then conducted a search of the Tacoma.  Inside the Tacoma, investigators found a protein powder container filled with liquid.  Investigators later recovered a similar protein powder container filled with liquid in a vehicle driven by BAEZ GUERRERO on February 26, 2024, described below.  Based on experience and training, investigators believe that members of this DTO transport narcotics along with these protein powder containers filled with liquid so that they can quickly mix the narcotics with the liquid in the protein powder container in the event they are stopped by law enforcement personnel.

36.     REYNOSO was taken to Portsmouth Hospital where he was evaluated, issued a summons for resisting arrest, and released.  MENDEZ HERRERA was arrested and taken to Portsmouth, New Hampshire Police Department.   During the booking process, MENDEZ HERRERA provided the phone number 857-302-8456—the same telephone number CW had used to communicate via WhatsApp with MENDEZ HERRERA (the 8456 Phone).   MENDEZ HERRERA was also released with a summons to appear on New Hampshire charges for transporting drugs in a motor vehicle.

37.     Two days later, on October 13, 2023, investigators spoke with the CW, who had been in communication with MENDEZ HERRERA following the car stop.  According to the CW, MENDEZ HERRERA told the CW that he was concerned that he was being surveilled by law enforcement and explained that he was going to drop his phone.  Based on my training and experience, I know that drug traffickers often change their cellular telephone numbers to avoid being monitored or tracked by law enforcement.

38.     On October 19, 2023, CW provided investigators with a new phone number for MENDEZ HERRERA – 929-204-2153 (the "2153 Phone").  According to the CW, a third party who knew both "Chachi" (MENDEZ HERRERA) and the CW, told the CW that MENDEZ HERRERA had established the 2153 Phone as his new number.

39.     On October 20, 2023, the CW was contacted directly by MENDEZ HERRERA via the WhatsApp messaging application, now utilizing the 2153 Phone.  MENDEZ HERRERA messaged the CW stating, "*Soy chachi ese mi Nuevo numero*"— I am Chachi, this is my new number.  The CW understood this message to mean that MENDEZ HERRERA was now using the 2153 Phone in furtherance of his drug trafficking activities.  Investigators reviewed this message on the CW's telephone and confirmed that the message was sent from the 2153 Phone. Investigators determined that usage on the prior telephone number MENDEZ HERRERA used to communicate with the CW (the 8456 Phone) dropped dramatically after October 12, 2023, and further determined that the 2153 Phone was activated on or about October 17, 2023.

40.     Continuing with their text message communications on October 20, 2023, the CW responded to MENDEZ HERRERA with a text message through WhatsApp explaining that the CW had received MENDEZ HERRERA's new phone number from their shared acquaintance the day prior.

13

41.     MENDEZ HERRERA replied by sending a voice recording that was approximately 15 seconds in length.  In the recording, MENDEZ HERRERA asked the CW to talk to the CW's drug customers to see if they wanted to obtain a sample of drugs that were available for distribution by MENDEZ HERRERA.  The CW and investigators understood MENDEZ HERRERA to be offering to provide narcotics samples to entice new drug customers.

42.     MENDEZ HERRERA and the CW then exchanged several additional text messages discussing MENDEZ HERRERA's location.  MENDEZ HERRERA sent a text message to the CW stating, "Toy en Maine," which the CW understood to mean that MENDEZ HERRERA was currently in Maine.   As described above, the CW was familiar with MENDEZ HERRERA's typical *modus operandi* of traveling from Massachusetts up to Maine to deliver narcotics to customers.  As such, investigators believed that MENDEZ HERRERA was likely in Maine delivering drugs to customers on October 20, 2023, and further believed that MENDEZ HERRERA wished to identify new customers to whom he could provide drug samples, all with the help of the CW.

*On the Night of February 24-25, 2024, MENDEZ HERRERA*
*Traveled From Maine to the Area of 500 Broadway in a Rented Vehicle.*

43.     On February 24, 2024, pursuant to a court-authorized warrant, investigators were monitoring the location information for the 2153 Phone, used by MENDEZ HERRERA.  The location information showed the 2153 Phone moving south from Maine along I-95.  To confirm MENDEZ HERRERA was in fact using the 2153 Phone at this time, investigators directed the CW to call MENDEZ HERRERA on the 2153 Phone to discuss potential payment for a shipment of methamphetamine the CW and MENDEZ HERRERA had been negotiating at the direction of investigators.  The CW called the 2153 Phone and spoke to MENDEZ HERRERA regarding the

potential methamphetamine shipment.  The CW then reported to investigators that CW had spoken to MENDEZ HERRERA.  CW also reported to investigators that the CW could hear at least one or more additional Hispanic males speaking in the background while the CW spoke with MENDEZ HERRERA.  Based on this information, investigators believed that MENDEZ HERRERA had the 2153 Phone on his person and was traveling with other male individuals.

44.     At approximately 11:40 p.m., using the location data for the 2153 Phone, investigators located the vehicle they suspected MENDEZ HERRERA was using, a gray 2024 Toyota Highlander, bearing Massachusetts registration 5GWN77 (the "Highlander").  RMV records confirmed that the Highlander was registered to the car rental company Expressway Toyota at 700 Morrissey Boulevard, Dorchester, Massachusetts.  This was the same rental car company used to rent the Tacoma from the October 11, 2023 stop, of MENDEZ HERRERA and REYNOSO described above, which resulted in the seizure of suspected fentanyl and cocaine.  Investigators made several more observations and confirmed that the Highlander was in the vicinity of the location of the 2153 Phone each time.  Investigators continued to monitor the location of the 2153 Phone and conduct physical surveillance of the Highlander as it drove from Maine, through New Hampshire, to Massachusetts.

45.     At approximately 12:31 a.m. (now on February 25, 2024), the Highlander, now in Massachusetts, exited the highway and eventually entered the parking area of 500 Broadway.  Location data from the 2153 Phone confirmed that the phone continued to be in the same vicinity as the Highlander.[2]

---

[2] Investigators had previously identified this apartment complex as a potential stash location for the DTO.  Specifically, investigators had seen MENDEZ HERRERA and REYNOSO depart from the area of the 500 Broadway on October 11, 2023, the day investigators stopped their vehicle and seized suspected fentanyl cocaine from REYNOSO's person.  Additionally, on November 12, 2023, investigators monitoring the location data for the 2153 Phone, observed that the

46.     At approximately 12:33 a.m., investigators observed the Highlander park in the parking lot outside 500 Broadway.  Investigators then observed three individuals run quickly between a row of parked cars.  The individuals were looking over their shoulders.  Investigators were able to move closer and observe MENDEZ HERRERA to be one of the individuals moving quickly through the parking lot.  The two other individuals with MENDEZ HERRERA were each carrying duffle bags.  The men walked along the grass adjacent to the building, but investigators could not see which door they eventually entered.  At approximately 12:47 a.m., investigators terminated physical surveillance in the area.

47.     Investigators continued to monitor the location data for the 2153 Phone.  The 2153 Phone remained in the vicinity of 500 Broadway until approximately 1:12 a.m.  The 2153 Phone then began moving south towards Dorchester, Massachusetts.  The 2153 Phone arrived in the vicinity of 779 Columbia Avenue, Dorchester, Massachusetts at approximately 1:32 a.m.  At this time, the location data began reporting as "absent subscriber" which is consistent with the device being powered off.  As described above, MENDEZ HERRERA's Dominican driver's license identified his home address as 779 Columbia Road, Apartment #1, Dorchester, Massachusetts.  Based on experience and training and the location data from the 2153 Phone, investigators believe that MENDEZ HERRERA left the area of 500 Broadway and drove to his residence for the remainder of the night.

48.     Based on experience and training, the prior observations at 500 Broadway, the fact that MENDEZ HERRERA informed the CW that he regularly trafficked narcotics in Maine and

---

phone travelled from Maine to the vicinity of 500 Broadway.  Investigators placed surveillance outside 500 Broadway and observed MENDEZ HERRERA and two other males exit a Toyota Camry registered to Expressway Toyota at 700 Morrissey Boulevard, Dorchester, Massachusetts.  The men were carrying a duffle bag with them.

transported drug proceeds back to Massachusetts, the fact that this trip from Maine to Massachusetts took place in a rental vehicle in the middle of the night, the surreptitious movement by MENDEZ HERRERA and the other individuals into the apartment building around 12:30 a.m. while carrying duffle bags, the short duration of MENDEZ HERRERA's stay inside 500 Broadway, and the 2153 Phone's location data, investigators believe that MENDEZ HERRERA and the other men transported drug proceeds from Maine, where they were selling drugs, down to an apartment in 500 Broadway.

*On February 26, 2024, Investigators Seized*
*One Kilogram of Fentanyl from BAEZ GUERRERO and CASTILLO.*

49.     On February 26, 2024, the same NHSP trooper who pulled over MENDEZ HERRERA and REYNOSO on October 11, 2023 was on patrol on I-95 in New Hampshire. The trooper observed the Highlander (the same Highlander MENDEZ HERRERA was riding in two days prior as described above) impeding the flow of traffic and activated his cruiser's blue lights. The Highlander was still rented from Expressway Toyota at 700 Morrissey Boulevard, Dorchester, Massachusetts, the same rental establishment from which the Tacoma from the October 11, 2023 stop and subsequent drug seizure was rented.

50.     After the trooper activated his cruiser's blue lights, the Highlander took an extended period of time to pull over on the right side of the highway. After the Highlander was safely pulled over the side of the highway, the trooper approached the vehicle and identified the driver as BAEZ GUERRERO. Unlike the October 11, 2023 stop of the Tacoma, this stop was not made at the request of the DEA investigators.

51.     BAEZ GUERRERO provided the trooper with his Dominican driver's license and a copy of the Highlander's rental agreement. The rental agreement identified the individual who

rented the Highlander as "Rachel Tavarez." The trooper also identified the only other occupant of the Highlander, seated in the front passenger seat, as CASTILLO. Because the trooper spoke English and the vehicle occupants spoke Spanish, the trooper communicated with the occupants of the vehicle primarily through a translation application on his cellular phone.

52.     Because the registered renter of the Highlander was not present in the vehicle, the trooper asked BAEZ GUERRERO who rented the vehicle, and he replied, "my wife." The trooper asked questions about where the two men were headed and what they were doing. The men gave inconsistent and illogical answers. Additionally, the trooper observed a knot from a plastic baggie on the front passenger side floor of the Highlander. Based on experience and training, the trooper recognized this knot as consistent with knots used to tie off plastic baggies containing narcotics.

53.     The trooper also observed a plastic baggie tucked into CASTILLO's waistband. Based on experience and training, the trooper knew that it was common for individuals possessing illegal drugs to hide them in bags on their persons. At this time, the trooper asked CASTILLO to exit the vehicle and he was placed into handcuffs. Another trooper had arrived on scene and asked BAEZ GUERRERO to exit the vehicle. The troopers continued to inquire where the men were headed, and they were unable to provide an answer.

54.     Through the translation application on his phone, the trooper asked BAEZ GUERRERO if he would consent to the search of the Highlander by the troopers. After reviewing the consent-to-search form, BAEZ GUERRERO consented to the search of the Highlander.

55.     The troopers searched the Highlander. They found a protein powder container with some liquid inside, similar to the protein powder container with liquid they had found during the October 11, 2023 search of MENDEZ HERRERA's vehicle. They found an igloo container containing a purple color sludge mixture. The purple sludge was similar in color to the purple

18

powder believed to be fentanyl seized during the October 11, 2023 search of MENDEZ HERRERA's vehicle. This sludge mixture was sent to the DEA laboratory for testing and the testing confirmed the presence of fentanyl, cocaine, p-Fluorofentanyl (an analogue of fentanyl), caffeine, and xylazine, with a total weight of 1,035 grams.

56.     The troopers also found fresh milk on the right passenger seat, spilled milk on the floor mat, and milk running down the back side of the passenger seat. Additionally, the trooper observed there was a liquid substance on CASTILLO's hands which he had left on the cruiser's hood after touching it. This residue was collected and sent to the DEA laboratory for testing. The testing confirmed the presence of cocaine in the residue. Based on experience and training, the presence of purple colored substance containing fentanyl, the presence of milk and the apparent spill in the vehicle, and the presence of liquid on CASTILLO's hands which tested positive for cocaine, investigators believe that after seeing the trooper activate his blue lights, while sitting in the passenger seat next to BAEZ GUERRERO, CASTILLO had attempted to destroy or dilute the fentanyl with milk inside the igloo container to avoid its discovery by investigators.

57.     BAEZ GUERRERO presented his cellular phone to the trooper and the trooper identified the phone number as 781-767-8005 (the "8005 Phone"), with an international mobile equipment identifier ("IMEI") of 350496303763235. The subscriber for the 8005 Phone was Rachell Tavarez, at 863 Broadway Apt. 407, Saugus, Massachusetts 01906.

*On April 17, 2024, Investigators Observed BAEZ GUERRERO and CASTILLO, Arrive at 500 Broadway, Apartment # 1158 After Departing a Residence in Maine Used for Drug Trafficking; Investigators Believe Melody Madura Guerrero Transported Suspected Drug Proceeds to Target Location 2.*

58.     On April 17, 2024, investigators established surveillance in the parking lot outside 500 Broadway. Prior to April 17, 2024, as described above, investigators had identified this apartment

complex as a potential stash location for the DTO.  Additionally, on March 12, 2024, investigators observed a male exit the rear outer door of 500 Broadway, Apartment # 1158, Malden, Massachusetts ("Apartment # 1158") and enter a blue Acura, which investigators had previously identified as being used by the DTO.  Apartment # 1158 is an apartment on the first floor of the apartment building and has a rear patio entrance which investigators can observe from the outside of the building.

59.  At approximately 1:02 p.m., investigators observed a white Toyota Rav4 back into a parking space in the vicinity of the outer patio door to Apartment # 1158.  An unidentified female ("UF") opened the rear patio door to Apartment # 1158 and looked at the Rav4, then returned to the apartment.

60.  At approximately 3:17 p.m., investigators observed the Highlander park a few parking spaces to the right of the rear patio door to Apartment # 1158.  The Highlander was the same gray 2024 Highlander, bearing Massachusetts registration 5GWN77, rented from Expressway Toyota at 700 Morrissey Boulevard, Dorchester, Massachusetts, investigators had observed during the surveillance of MENDEZ HERRERA on February 24, 2024, and during the vehicle stop and fentanyl seizure from BAEZ GUERRERO and CASTILLO on February 26, 2024.

61.  Approximately one minute after the Highlander parked, investigators observed CASTILLO exit the left rear passenger seat of the vehicle.  CASTILLO was carrying cake in a plastic container in his hand.  CASTILLO then walked to the trunk of the Highlander, which had been opened remotely, removed a dark Adidas duffle bag and a paper Stop & Shop grocery bag and took those items inside the rear patio door to Apartment # 1158.  Investigators also observed an unidentified male ("UM") get out of the Highlander's driver's seat and speak on a cellular phone.  Investigators then observed BAEZ GUERRERO exit the front passenger seat of the

20

Highlander. BAEZ GUERRERO was wearing a light, blue colored hooded sweatshirt with paisley patterns. Inside the open trunk, investigators observed a case of water, a chocolate milk mix container, and a protein powder container. The UM and BAEZ GUERRERO each carried items into the rear patio door of Apartment # 1158. As described above, during vehicle stops of MENDEZ HERRERA and BAEZ GUERRERO, each man had a protein container in his vehicle. Investigators believe these plastic containers are used by the DTO to mix liquid and narcotics in an attempt to destroy or dilute the narcotics in the event of law enforcement presence.

62. Once inside Apartment # 1158, investigators observed CASTILLO struggling to close the blinds on the window of the apartment.

63. After the surveillance described above, investigators were able to review pole camera footage from the area around 11 Back Brooks Road, Monroe, Maine ("11 Back Brooks Road"), the location investigators believed MENDEZ HERRERA was using to sell fentanyl out of in Maine.[3] On April 17, 2024, at approximately 11:20 a.m., through this pole camera footage, investigators were able to observe an SUV of the same type, size, and color as the Highlander arrive at 11 Back Brooks Road and pull to the right side of the driveway. Investigators were able to observe that three occupants of this SUV exited, approached the front door of 11 Back Brooks Road. Based on the pole camera footage, investigators could not tell if all three men entered the residence. One of the occupants of the SUV was wearing a distinct, blue-colored sweatshirt with paisley patterns that investigators observed BAEZ GUERRERO wearing at Apartment # 1158

---

[3] On March 6, 2024, MENDEZ HERRERA had posted an Instagram story. Using the posted story and Google Maps, investigators confirmed MENDEZ HERRERA took the video in the vicinity of 11 Back Brooks Road. Additionally, location information for the 2153 Phone, used by MENDEZ HERRERA showed that during March 6, 2024, the phone was located in the vicinity of 11 Back Brooks Road. Based on this information, investigators placed a pole camera outside 11 Back Brooks Road.

several hours later.  Less than ten minutes after the three occupants entered the residence, pole camera footage showed them exit the residence and return to the SUV.  The SUV then departed the driveway of 11 Back Brooks Road.  Using Google Maps, investigators determined that the drive time between 11 Back Brooks Road in Monroe, Maine, and 500 Broadway would be approximately 3:30 hours.  Given this timing, if the SUV had not stopped, it would have arrived at the apartment complex at approximately 3:00 p.m.  As described above, investigators observed the Highlander arrive in the parking lot outside Apartment # 1158 at 3:17 p.m.  Based on these observations, investigators believe that the SUV at 11 Back Brooks Road, was in fact, the Highlander and the three occupants were BAEZ GUERRERO, CASTILLO, and the UM. Investigators further believe that these men likely picked up drug proceeds at the residence from which MENDEZ HERRERA was trafficking drugs and transported those proceeds down to Malden.     Additionally, at approximately 11:20 a.m., when the three men arrived at 11 Back Brooks Road, MENDEZ HERRERA, using the 2153 Phone, received two WhatsApp communications from BAEZ GUERRERO, using the WhatsApp account on the 8005 Phone.[4] Investigators believe BAEZ GUERRERO was informing MENDEZ HERRERA that BAEZ GUERRERO and the other two men had arrived at the 11 Back Brooks Road residence.

64.   Investigators continued to surveil the area around the back patio door of Apartment # 1158.  At approximately 5:43 p.m., investigators observed the UM exit the patio door holding a plastic grocery bag.  The UM approached the Highlander and placed the plastic bag inside the Highlander on the driver's side.  The UM then opened the left rear passenger door and retrieved a

---

[4] After this interaction, investigators reviewed toll data for the phones used by BAEZ GUERRERO and MENDEZ HERRERA.  Between April 20, 2024 and May 9, 2024, BAEZ GUERRERO, using his 8005 Phone to communicate over WhatsApp, was in contact with MENDEZ HERRERA's 2153 Phone approximately 121 times.

clear bag containing a powdery substance and a charging cable.  The UM closed the Highlander door and reentered the patio door to Apartment # 1158.  Investigators could see inside Apartment # 1158 and observed the UM and BAEZ GUERRERO standing close to one another and placing items on the countertop.

65.    At approximately 5:48 p.m., investigators observed BAEZ GUERRERO exit Apartment # 1158 and enter a blue 2021 Acura RDX, bearing Massachusetts registration 3KEF19 (the "Acura").  BAEZ GUERRERO was holding a reusable shopping bag and placed it in the trunk of the Acura.  BAEZ GUERRERO then got into the driver's seat of the Acura and drove out of the apartment complex parking lot.  Investigators continued to maintain surveillance on both the Acura and the area around the patio door to Apartment # 1158.

66.    At approximately 6:13 p.m., investigators observed a white 2024 Mercedes AMG GLE, bearing Massachusetts registration 2EKD86 (the "Mercedes"), park in the vicinity of the rear patio door of Apartment # 1158.  Investigators observed Melody Madura Guerrero[5] exit the Mercedes and approach the rear patio door to apartment #1158.  She knocked on the glass door and the UM let her inside.

---

[5] In communications between the CW and MENDEZ HERRERA, MENDEZ HERRERA had stated that his "boss" set the prices for drugs and communicated with the drug suppliers.  Investigators identified MENDEZ HERRERA's boss as Maiki Baez.  However, Baez was eventually arrested.  MENDEZ HERRERA told the CW that Baez's wife, Madura Guerrero, had taken over the drug business for Baez because Baez had been arrested and was being transported to the Dominican Republic.  Investigators have confirmed that Maiki Baez was arrested by federal authorities and is in the process of being removed to the Dominican Republic.  For example, MENDEZ HERRERA told the CW that his current boss in the DTO, Madura Guerrero, set the prices of fentanyl at $25 per gram, but that MENDEZ HERRERA was charging $30 per gram.  Additionally, MENDEZ HERRERA stated that Baez's brother "Rubio Baez" was also assisting Madura Guerrero with the drug business.  The CW provided investigators with "Rubio Baez's" Instagram account and by reviewing photos on the Instagram account, investigators were able to confirm that "Rubio Baez" was BAEZ GUERRERO.

67. Investigators could see Madura Guerrero inside the apartment speaking with CASTILLO. Investigators then observed Madura Guerrero, CASTILLO, and the UM counting money. Madura Guerrero then placed money into a black plastic grocery bag.

68. At approximately 6:27 p.m., investigators observed Madura Guerrero exit Apartment # 1158 with the large plastic bag in her hand. The bag was wrapped tightly around the money and investigators could see that the bag contained a large rectangular shape, indicating a large amount of money. Madura Guerrero entered the driver's seat of the Mercedes. After Madura Guerrero exited Apartment # 1158, investigators observed an unidentified female ("UF-2") and two young males exit Apartment # 1158 and enter the Mercedes. Investigators had previously observed the two young males exit Apartment # 1158 and walk around the parking lot.

69. The UM then exited Apartment # 1158 and entered the Highlander. CASTILLO did not exit the apartment. BAEZ GUERRERO was still being surveilled by investigators driving the Acura in the Boston area at this time. The Mercedes and the Highlander both pulled out of the parking lot and departed from the apartment complex.

70. Investigators observed the Mercedes make multiple stops after departing the apartment complex. Eventually, at 9:45 p.m., the Mercedes pulled into the driveway outside Target Location 2. Madura Guerrero exited the Mercedes and was holding the same black plastic bag in which she had placed money in Apartment # 1158. The bag still contained the same large rectangular object consistent with a large amount of currency. Madura Guerrero used a key to enter the building in which Target Location 2 is located (the "Target Location 2 Building") and was met by another unknown male ("UM-2"). UM-2 and Madura Guerrero interacted briefly in the front entrance. The outer door remained open. At approximately 9:51 p.m., investigators observed Madura Guerrero exit the same door carrying the same black plastic grocery bag.

24

However, the shape/size of the grocery bag was different and the object inside appeared to be significantly heavier than the money she had been transporting in the bag prior to entering the Target Location 2 Building. Madura Guerrero entered the Mercedes and drove away. Eventually, the Mercedes entered an area where investigators could not maintain surveillance and surveillance was terminated.

71.     Based on experience and training and the observations described above, investigators believe that BAEZ GUERRERO and others met with MENDEZ HERRERA in a residence in Maine used for drug trafficking to pick up drug proceeds. BAEZ GUERRERO then transported those proceeds down to Apartment # 1158 where the proceeds were counted. Madura Guerrero then packaged those drug proceeds and transported them to Target Location 2 to meet with another individual.

*On May 30, 2024, Investigators Seized Methamphetamine, Cocaine, and Fentanyl from ARIAS and ALMONTE After they Left Apartment # 1158 and Attempted to Evade Police.*

72.     On May 30, 2024, through the use of a covert camera, investigators were maintaining surveillance in the area around Apartment # 1158. At approximately 10:45 and 10:55 a.m., investigators observed two unidentified males enter the rear patio door of Apartment # 1158. At approximately 11:35 a.m., investigators observed the two males exit the rear patio door of Apartment # 1158. One male was wearing a white fur-lined jacket, and one male was wearing a black sweatshirt. The male wearing the black sweatshirt was holding a full-sized paper grocery bag.

73.     Investigators attempted to place physical surveillance in the area outside Apartment # 1158. Before they arrived in the area, at approximately 11:45 a.m., investigators observed a gray

2024 Toyota Highlander, bearing Massachusetts registration 4SME34 (the "Highlander II")[6] traveling in the opposite direction away from the area of Apartment # 1158. Investigators immediately recognized the Highlander II from surveillance conducted on May 28-29, 2024. Investigators identified the driver of the Highlander II as ARIAS. Investigators reversed course and tried to regain visual contact with the Highlander II. At approximately 11:55 a.m., investigators were able to establish visual surveillance of the Highlander II parked at a gas station on Route 1. When the Highlander II departed the gas station, investigators began following the Highlander II as it drove north on Route 1. The Highlander II continued north onto I-95 in the direction of New Hampshire.

74.     Investigators requested that the NHSP assist with a motor vehicle stop of the Highlander II. At approximately 12:35 p.m., a New Hampshire state trooper in a marked cruiser activated his blue lights and attempted to pull over the Highlander II. Investigators confirmed there were two men in the vehicle. The Highlander II continued to move down the highway and took an extended period of time to pull over onto the shoulder. Once the vehicle stopped, the passenger jumped out of the Highlander II and fled the scene on foot. The driver of the vehicle then pulled the Highlander II back onto the road and fled the traffic stop.

---

[6] On May 28, 2024, while conducting surveillance in the area of 500 Broadway, location data for the 2153 Phone showed the phone moving north on Route 1 approaching I-95. Investigators attempted to catch up with the vehicle in which the 2153 Phone was located. At 12:04 p.m., the location data indicated "absent subscriber" which investigators understood to mean that the phone was shut off. Investigators continued to search in the area of the last the 2153 Phone location data. At approximately 12:48 p.m., on I-95 investigators located the Highlander II. The Highlander II was registered to Expressway Toyota at 700 Morrissey Boulevard, Dorchester, Massachusetts. As described above and below, members of this DTO regularly rented other vehicles from Expressway Toyota and used those vehicles to transport suspected narcotics.

75.     Investigators lost sight of the Highlander II as it fled the traffic stop, but a short time later, investigators located the Highlander II pulled over, locked, and abandoned on the side of Coakley Road in Portsmouth, New Hampshire.   Investigators also lost sight of the fleeing passenger.

76.     Upon arriving at the abandoned Highlander II, troopers used a K-9 to track the driver who had left the Highlander II abandoned.   Following the K-9, troopers were able to locate the male in the white fur-lined jacket seen exiting Apartment #1158 earlier in the day.   Through visual identification and a Dominican identification card on the man's person, investigators confirmed this man was ARIAS.

77.     Investigators towed the abandoned Highlander II to a police barracks and searched the vehicle.   Inside, investigators found two shards of crystal substance consistent in appearance with crystal methamphetamine.   Investigators sent these shards of crystal to the DEA laboratory for testing, and they tested positive for the presence of methamphetamine and weighed 2.26 grams. Investigators also found a paper shopping bag consistent in appearance with the shopping bag carried by the man in the black sweatshirt out of Apartment #1158.   Under the bag, investigators found two plastic knots that appeared to be ripped from larger plastic bags.   One of the knots had purple powder residue in it.   As described above, investigators have seized purple powder mixed with liquid containing fentanyl from this DTO.   On the front passenger seat, investigators observed white powder residue.   In the back seat, investigators found two empty containers of milk. Described above and below, the DTO members often mix milk with narcotics in protein containers in an attempt to destroy the narcotics if they are pulled over by police.

78.     Also, inside the glove box, investigators located the rental agreement for the Highlander II.   The Highlander II was rented from Expressway Toyota at 700 Morrissey

27

Boulevard, Dorchester, Massachusetts by Rachel Tavarez.  The rental agreement had phone

numbers listed: 781-888-2483 (the "2483 Phone") and 857-407-5177 (the "5177 Phone"), both

subscribed to Rachell Tavarez at 863 Broadway, Apt. 407, Saugus, MA 01906.  As described

below, investigators also believe that BAEZ GUERRERO used the 2483 Phone.

79.     In an attempt to locate the fleeing passenger, troopers also used a K-9 to track the

passenger starting in the area where he fled the Highlander II.  Upon following the K-9 tracker,

investigators found a black plastic protein container full of liquid.  This container was consistent

with other protein containers seized from this DTO during previous motor vehicle stops described

above.  Based on experience and training, investigators believe that members of this DTO transport

narcotics along with these protein powder containers filled with liquid so that they can quickly mix

the narcotics with the liquid in the protein powder container in the event they are stopped by law

enforcement personnel.  The protein container and liquid were sent to the DEA laboratory and the

testing showed the presence of cocaine and fentanyl, weighing 3,306 grams.

80.     Investigators continued their efforts to locate the fleeing passenger and continued

to search the area.  At approximately 2:27 p.m., investigators observed a blue 2021 Acura RDX,

bearing Massachusetts registration 3KEF19 (referred to as the "Acura" above) traveling in the area

in which the passenger fled.  Investigators had observed BAEZ GUERRERO driving the Acura

on April 17, 2024 after he exited Apartment #1158.  Since investigators had observed the Acura

near Apartment #1158 before, investigators began to surveil it.  Investigators identified the driver

of the Acura as Rachel Tavarez ("Tavarez").  Tavarez parked the Acura in a commercial parking

lot.  Tavarez was speaking on her cell phone and looking from left to right as she drove.

Investigators believed she was searching for something or someone in the area.

28

81.     Tavarez departed the parking lot in the Acura and traveled to a different parking lot.  In the second parking lot, she pulled the Acura to the side near heavy vegetation.  Investigators then observed a male quickly run out of the vegetation, open the rear passenger door, and enter the Acura.

82.     Investigators stopped the Acura.  Investigators asked Tavarez to exit the vehicle and she was placed in handcuffs and temporarily detained in a police cruiser.  The male in the rear passenger seat of the Acura was also taken into custody and identified as ALMONTE.

83.     Investigators found a cellular phone in the Acura which was still on an active call.  Investigators placed the phone on mute and a Spanish-speaking investigator overheard people conversing on the phone about whether or not a male had been located and whether or not the male was in law enforcement custody.   On the screen of the cell phone, investigators observed notifications of text messages from a contact named "Cristofel" with a profile photo of the letter "C."  Investigators observed notifications of four missed calls from the contact "C."  Investigators found another cell phone inside the vehicle in the center console.

84.     Investigators informed Tavarez that they would like to speak with her.  Before they spoke with her, they released Tavarez from the cruiser, removed the handcuffs, and informed her that she was free to leave.  Tavarez stated that she wanted to "help" the investigators and would speak with them.

85.     Tavarez told investigators that the phone with the missed calls described above was her phone and that her phone number was the number assigned to the 5177 Phone.  Investigators confirmed her cell phone was the 5177 Phone by calling it in their presence and observing the cell phone ring.  She stated that the cell phone found in the center console belonged to the passenger in the car (ALMONTE) who she knew as "Condor."  She provided investigators with "Condor's"

29

phone number as 857-379-4284 (the "4284 Phone").  Investigators called the 4284 Phone and the cell phone seized from the center console rang.  Investigators also located the cell phone case for the 4284 Phone, and it contained a Dominican identification card bearing the name and photo of ALMONTE.  ALMONTE also confirmed to investigators that the 4284 Phone belonged to him.

86.     Tavarez explained that she had driven up to New Hampshire after receiving a phone call from ALMONTE to pick her up.  ALMONTE directed her to the parking lot from which she eventually picked him up.  Tavarez stated that her "boyfriend" could explain the situation to investigators if they had more questions.  Tavarez showed the contact information for her "boyfriend" from her cell phone as "Cristofel Baez" with the number associated with the 2483 Phone, and an iCloud account address of "Cristofelbaez23@icloud.com".  As stated above, investigators had seized narcotics from BAEZ GUERRERO on February 26, 2024 while he was driving a rental vehicle from Expressway Toyota rented by Tavarez listing the 2483 Phone on the rental agreement.

87.     Tavarez stated that she had been on the phone with "Melody" when police pulled her over.  Investigators believe she was referring to Melody Madura Guerrero who investigators had identified at Apartment #1158 packaging and transporting money believed to be drug proceeds on April 17, 2024.

88.     Investigators then provided a summons to ALMONTE.  Investigators told ALMONTE he was free to leave and returned his cell phone to him.  Investigators then showed ALMONTE a photo of ARIAS and asked if ALMONTE had a phone number for him.  ALMONTE identified ARIAS as "Peca" and then showed investigators his cell phone in which the contact phone number for "Peca" was 978-242-4376 (the "4376 Phone").

*On June 5, 2024, Investigators Seized Fentanyl and Cocaine from CASTILLO and MONTERO*
*After they Left Apartment #1158.*

89.     In the morning of June 5, 2024, investigators maintained electronic surveillance of the area around Apartment #1158 through a covert camera.   At approximately 9:03 a.m., investigators observed a red Honda sedan, bearing Massachusetts registration 3RKF55, registered to REYNOSO, pull into the parking lot outside Apartment #1158.   Investigators observed REYNOSO driving the Honda.   He manipulated a cell phone for a moment before he exited his vehicle.   REYNOSO approached the driver's door of a silver/gray 2023 Toyota Tacoma, bearing Massachusetts registration 3RZT13, registered to Expressway Toyota at 700 Morrissey Boulevard, Dorchester, Massachusetts (the "Tacoma").   REYNOSO then returned to his Honda and departed the area.   Due to the camera angle, investigators could not observe whether REYNOSO entered the Tacoma or placed anything inside it.

90.     At approximately 9:08 a.m., investigators observed CASTILLO walk to the area of the rear patio door to Apartment #1158 and bend down near the ground on the right side of the door.   Investigators believe he was putting a key to Apartment #1158 in that area.   CASTILLO then walked to the driver's side door of the Tacoma.   Investigators also observed MONTERO wearing an orange safety vest and carrying a full-sized paper grocery bag along with a smaller bag, both in his left hand.   MONTERO approached the passenger side of the Tacoma.   Both CASTILLO and MONTERO entered the Tacoma and CASTILLO drove the vehicle away from the area.

91.     At approximately 9:19 a.m., investigators observed REYNOSO return to the area of Apartment #1158 in the same red Honda as before.   He parked near the rear patio entrance to Apartment #1158.   He bent over in the same area that CASTILLO had deposited something

(believed to be a key) only ten minutes before.  REYNOSO then walked to the rear main entrance of 500 Broadway.

92.     Investigators established physical surveillance on Route 1 north and attempted to locate the Tacoma.  At approximately 9:29 a.m., investigators identified the Tacoma traveling north on Route 1 and maintained physical surveillance of the vehicle.  The Tacoma entered I-95 and traveled north through New Hampshire and into Maine.  Investigators requested assistance from the Maine State Police to conduct a motor vehicle stop.

93.     At approximately 11:25 a.m., Maine state troopers located the Tacoma and initiated a traffic stop.  The Tacoma took over a minute to eventually pull over on the side of the road. Through their Dominican identification cards, Troopers identified the driver as CASTILLO and the passenger as MONTERO.  Troopers also sent photographs of the two men to investigators who confirmed they were the same men who had entered the Tacoma outside Apartment #1158.

94.     Troopers communicated with CASTILLO and MONTERO through a translation application on their cell phones.  The men both told the trooper that they were going into Maine for a construction job.  They could not identify the town they were heading to.  The troopers identified white powder on the floor of the passenger floorboard.  They also observed purple powder smeared on the side of the driver's seat.  The purple powder was consistent with purple powder previously seized from this DTO and confirmed as fentanyl described above.

95.     The trooper searched the passenger compartment of the vehicle and found a plastic pitcher with a green lid containing a chunky, liquid mixture colored brown and the top and purple

at the bottom.[7]  The length of time it took to pull over, the purple powder in the vehicle, and the presence of the purple sludge mix in the plastic pitcher is consistent with previous attempts by members of this DTO to destroy narcotics after being pulled over by police described above.

96.     Additionally, troopers located a paper grocery bag containing various plastic bags and packaging materials consistent with materials used to package narcotics for sale.  The baggies had been ripped open and appeared to contain purple powder.  The paper bag was also stained with purple powder.  Investigators sent the powder mix to the DEA laboratory for testing and the results showed the presence of cocaine and fentanyl, weighing 2,567 grams.

97.     The troopers also asked each man for his phone number.  CASTILLO identified his phone number as 617-581-7277 (the "7277 Phone").  MONTERO identified his phone number as 774-849-1512 (the "1512 Phone").[8]

---

[7] On June 3, 2024, investigators had observed CASTILLO carry this same pitcher to the Tacoma outside Apartment #1158.

[8] In addition to this stop and seizure of fentanyl, investigators had observed MONTERO working with other DTO members on other occasions and driving from Massachusetts to Maine.  For example, on July 8, 2024, MONTERO and CASTILLO traveled from a known stash location in Massachusetts to known distribution locations in Maine. On this trip, investigators stopped MONTERO and CASTILLO's vehicle but were unable to locate narcotics in the vehicle. However, investigators later learned that that a vehicle used by the DTO, a white 2015 Nissan Rogue, bearing Massachusetts registration 2CBR13, had travelled to Maine that same night.  On August 21, 2024, investigators seized cocaine and methamphetamine and two firearms from a hidden compartment in that Nissan Rogue, described below. Based on the travel of this vehicle, investigators believe the Nissan Rogue was carrying the narcotics for distribution in Maine and MONTERO and CASTILLO were simply driving up to Maine to work at the distribution locations.   On July 14, 2024, MONTERO and CASTILLO returned to Massachusetts from Maine.  Additionally, during the August 13, 2024 search of CASTILLO's vehicle which resulted in the identification of $1,000 of suspected drug proceeds, investigators also found several money remitter receipts in the vehicle, including a receipt from MONTERO for $1,000 from August 11, 2024, described below.

*MENDEZ HERRERA Continued to Communicate with the CW Regarding Drug Trafficking.*

98.    On July 8, 2024, at approximately 10:20 p.m., at investigators' direction, the CW made a recorded call to MENDEZ HERRERA at phone number 603-804-0210 (the "0210 Phone").[9]

99.    In lightly coded language, MENDEZ HERRERA explained that he wanted the CW to provide him with three kilograms of narcotics.  Based on the CW's knowledge and the facts learned during this investigation, including the numerous drug seizures described above, the CW and investigators believe that MENDEZ HERRERA requested three kilograms of fentanyl. MENDEZ HERRERA requested that the kilograms of fentanyl be sold in three different colors: white, yellow, and purple. MENDEZ HERRERA explained that he had the money available for the kilograms of fentanyl and wanted to purchase them quickly.  During this phone call, the CW believed the CW heard MENDEZ HERRERA providing instructions in Spanish to one or more individuals about where to park a vehicle.  The CW could also hear MENDEZ HERERA speak in English to someone, stating, "Come, come."  The CW believed that MENDEZ HERRERA was speaking to the CW during a drug transaction with one of MENDEZ HERRERA's drug customers.

---

[9] Investigators had identified the 0210 Phone used by MENDEZ HERRERA in April 2024.  On April 6, 2024, the CW informed investigators that MENDEZ HERRERA had gotten a new telephone number, the 0210 Phone. Investigators reviewed WhatsApp messages from the 0210 Phone to the CW.  In one text message from the 0210 Phone, MENDEZ HERRERA stated, "Soy Chachi."  The CW knows MENDEZ HERRERA as "Chachi."  The CW asked MENDEZ HERRERA if the CW should delete his old number, meaning the 2153 Phone, and MENDEZ HERRERA replied, "No."  The CW placed a recorded call to the 0210 Phone and MENDEZ HERRERA answered the phone.  In lightly coded language, the CW and MENDEZ HERRERA discussed the negotiated shipment of five pounds of crystal methamphetamine from a Mexican supplier to the CW.  MENDEZ HERRERA reaffirmed his commitment to help the CW sell the methamphetamine.  As described below, MENDEZ HERRERA is still using the 2153 Phone along with the 0210 Phone.  Based on experience and training, it is common for drug traffickers to use more than one phone number to keep different aspects of their drug-trafficking activities separate and to avoid law enforcement detection.

Location information for the 0210 Phone showed that the phone was located in the area of Waldo, County, Maine during the morning, afternoon, and evening hours of July 8, 2024.  Based on experience and training, and the patterns of this DTO, including MENDEZ HERRERA trafficking drugs in Maine, and the location data for the 0210 Phone, investigators also believe that MENDEZ HERRERA was engaged in a drug transaction while speaking to the CW on the 0210 Phone.

100.    On July 31, 2024, the CW received a text message over WhatsApp from phone number 617-238-8738 (the "8738 Phone"), which stated in Spanish, "Call me at that number[.]" Investigators have preserved this text message.  Several hours later, the CW received two text messages from the 8738 Phone, which both stated in Spanish, "I am Chachi."  The CW then called the 8738 Phone.  This call was recorded.  MENDEZ HERRERA answered.  MENDEZ HERRERA stated that he was in Boston and had left his other two phones back in Maine with one of the "workers."  Investigators understood this mean that MENDEZ HERRERA had left the 2153 Phone and the 0210 Phone in Maine with another member of the DTO.  MENDEZ HERRERA then stated he would return to Maine on August 2, 2024.  MENDEZ HERRERA then inquired about the potential drug purchase from the CW.  The CW demurred and stated that the CW's Mexican drug supplier was not being reliable, and the CW did not yet have the kilograms that MENDEZ HERRERA wanted.

101.    Later, on July 31, 2024, at approximately 9:11 p.m., the CW placed a recorded call to MENDEZ HERRERA at the 8738 Phone.  In lightly coded language, MENDEZ HERRERA explained that one of the DTO's vehicles had a "trap," or secret hiding compartment, inside the vehicle which the DTO members used to transport drugs from Massachusetts to Maine.  MENDEZ HERRERA then suggested that the CW could transport drugs from Massachusetts to Maine using that same vehicle with the trap.  MENDEZ HERRERA explained that the trap vehicle had

transported one kilogram of fentanyl and one kilogram of cocaine to Maine.  MENDEZ HERRERA then told the CW that the CW could transport one kilogram of narcotics for $1,200. MENDEZ HERRERA then stated that the CW should send the CW's drug customers directly to MENDEZ HERRERA so he could supply them and then would provide the proceeds to the CW after the sales were complete.

102.    On August 1, 2024, at investigators direction, the CW exchanged a series of text messages with MENDEZ HERRERA on the 8738 Phone.  MENDEZ HERRERA indicated that he was leaving for Maine soon.  The CW replied asking MENDEZ HERRERA to tell the CW when he arrived in Maine and asking where MENDEZ HERRERA would be staying.  MENDEZ HERRERA sent a photo which stated, "247 Troy Center Road Troy Maine 04987."  Based on experience and training, and the information described below, investigators believe that 247 Troy Center Road was one of the locations that MENDEZ HERRERA planned to sell drugs out of while he was in Maine.[10]

*On June 11, 2024, Investigators Observed ARIAS Meet with a Drug Customer near Apartment #1158 to Conduct a Suspected Drug Transaction.*

103.    On June 11, 2024, investigators were surveilling the target of a different narcotics investigation, Anderson Andujar Echavarria ("Andujar").[11]  Investigators observed Andujar operating a Jeep Grand Cherokee (the "Grand Cherokee").  At approximately 2:26 p.m., Andujar

---

[10] Toll records show that during the period of July 27, 2024, to July 30, 2024, the 8738 Phone was in contact with the 4284 Phone, used by ALMONTE, approximately 128 times, and phone number 978-943-2952 (the "2952 Phone") used by ARIAS, approximately 21 times.

[11] As part of this separate investigation, investigators conducted several controlled purchases of suspected crystal methamphetamine and pressed fentanyl pills from Andujar.  On September 25, 2024, Andujar was indicted for conspiracy to distribute fentanyl and multiple counts of distribution of fentanyl and methamphetamine.  24-cr-10301-IT.

drove the Grand Cherokee to the parking lot outside Apartment #1158. Andujar parked the Grand Cherokee in the left front of the apartment complex parking lot. Andujar appeared to be manipulating his cell phone.

104.   Once parked, investigators observed a grey 2008 Honda Accord, bearing Massachusetts registration 4NGM41, with VIN JHMCP26858C001607, registered to "Yomerly Gabriel Mendez Arias," at 56 Chester Street, Apartment #1, Lawrence, Massachusetts (the "2008 Accord"), park in the vicinity of the Grand Cherokee. At approximately 2:39 p.m., investigators observed ARIAS exit the 2008 Accord and approach the passenger side of the Grand Cherokee. A short time later, ARIAS walked away from the Grand Cherokee and entered 2008 Accord. ARIAS then departed the parking lot and appeared to be speaking on his cellular phone.

105.   Based on experience and training, the location of this meeting outside Apartment #1158, and the short duration of this meeting, investigators believe that ARIAS and Andujar conducted a drug transaction.

*On July 15, 2024, After CASTILLO Loaded a DTO Vehicle from Apartment #1158, ALMONTE Drove the Grey CRV to Maine.*

106.   On July 15, 2024, at approximately 1:21 p.m., investigators conducting physical surveillance in the area around Apartment #1158 and observed the 2008 Accord driving in the parking lot outside the apartment building. The vehicle drove out of the parking lot and directly to 65 Chester Street in Lawrence, Massachusetts. The 2008 Accord arrived at 65 Chester Street at approximately 1:50 p.m. and ARIAS exited the vehicle. The 2008 Accord is registered to ARIAS as 56 Chester Street, Apartment #1, Lawrence, Massachusetts. At approximately 1:52 p.m., investigators observed ARIAS walking along the walkway by the 2008 Accord while manipulating his cell phone.

107.    At approximately 1:53 p.m., investigators observed a Brown Toyota Sienna occupied by two unknown males park on the same side of the street as the 2008 Accord.  This brown Toyota Sienna was registered to 128 Maple Street, Apartment #1, Lynn, Massachusetts. [12]

108.    On July 15, 2024, at approximately 2:06 p.m., investigators observed the Toyota Sienna pull away from the curb and drive away.  Immediately after the Sienna pulled out, ARIAS entered the 2008 Accord and drove down Chester Street.  Based on experience and training, the common registration address between the Toyota Sienna and the Nissan Rogue, and the simultaneous departures of the Sienna and the 2008 Accord, investigators believe that ARIAS met with the unidentified males in the Toyota Sienna for the purpose of conducting a drug transaction. Investigators surveilled ARIAS in the 2008 Accord as he made several stops but at approximately 3:00 p.m., were unable to maintain surveillance.

109.    At approximately 2:33 p.m., the video from a covert camera outside Apartment #1158 showed a grey Honda CRV arrive in the rear parking lot.  This CRV appeared to be the same grey CRV investigators had observed DTO members driving on prior occasions. [13]   One minute later, a man appearing to be CASTILLO exited the vehicle and walked to the rear main entrance of the apartment complex.  At approximately 2:39 p.m., the same man who appeared to be CASTILLO exited the rear patio door of Apartment #1158 and walked to the grey CRV.

---

[12] On June 6, 2024, investigators had previously observed a Nissan Rogue registered to that same address in Lynn in the parking lot outside 500 Broadway.  On June 6, 2024, CASTILLO met with an unidentified male in that Nissan Rogue for a brief period of time outside 500 Broadway. Based on experience and training, the duration of that meeting, and the location outside 500 Broadway, investigators believe that CASTILLO met with the unidentified male to conduct a drug transaction.

[13] A grey 2021 Honda CRV, bearing Massachusetts registration 3WJY84, with Vehicle Identification Number ("VIN") 2HKRW2H50MH641191, registered to Michel Del Carmen Espinal Pena, at 438 Geneva Ave., Dorchester, Massachusetts (the "grey CRV").

CASTILLO made several trips from the rear patio door back and forth to the grey CRV. At approximately 3:10 p.m., two males approached the grey CRV, entered the vehicle, and departed from the parking lot. At this time, location data for the 4284 Phone, used by ALMONTE, showed that the phone was in the vicinity of Apartment #1158. After the two men drove away in the grey CRV, the location data for the 4284 Phone began to show the phone moving north through the greater Lawrence area, then northeast along I-95 into New Hampshire. At approximately 5:36 p.m., location data for the 4284 Phone showed that it was located in Seabrook, New Hampshire. Based on these observations and the location data for the 4284 Phone, investigators believed that ALMONTE was in the grey CRV.

110.   After this location in Seabrook, New Hampshire, investigators did not receive location data for the 4284 Phone for approximately one hour, indicating the phone was powered off. Investigators were unable to locate the grey CRV to conduct surveillance.

111.   At approximately 7:46 p.m., location data for the 4284 Phone indicated that it was in the vicinity of route 3 in Palermo, Maine. At approximately 7:54 p.m., using license plate readers, investigators confirmed the grey CRV was in the area of Route 3 in Palermo.

112.   At approximately 8:13 p.m., through video surveillance from a covert camera, investigators observed a grey Honda CRV consistent in appearance with the grey CRV described above turn into the driveway at 75 Lincolnville Road, Belmont, Maine ("75 Lincolnville Road"). This appearance is also consistent with a 20-minute travel time between the location in Palermo where the grey CRV was located earlier and 75 Lincolnville Road. Location data for the 4284 Phone also indicated it was in the vicinity of 75 Lincolnville Road. Based on experience and training, the various location data for the 4284 Phone and the grey CRV, and the patterns of this

DTO, investigators believe ALMONTE departed Apartment #1158 with narcotics to sell out of 75 Lincolnville Road in Maine.

*On July 28, 2024, ARIAS Drove from the area of Target Location 2 to Apartment #1158 to 75 Lincolnville Road and 247 Troy Center Road in Maine.*

113.    On July 28, 2024, investigators were monitoring the judicially authorized GPS tracking device affixed to a blue 2021 Acura RDX (the "RDX"), bearing Massachusetts registration 3KEF19.  On July 28, 2024, at approximately 2:27 p.m., the RDX departed from the area of Target Location 2.[14]  At approximately 3:05 p.m., after making one stop, the RDX arrived at the area of 5 Nazing Court, Dorchester, Massachusetts ("5 Nazing Court"), Tavarez's residence.

114.    After approximately 30 minutes, the RDX departed the area of Tavarez's residence and travelled to 56 Chester Street, Lawrence, Massachusetts, ARIAS's residence.  The RDX arrived at 56 Chester Street at approximately 4:11 p.m.  At approximately 4:22 p.m., the RDX departed from 56 Chester Street, stopped at a local restaurant for less than 10 minutes, then proceeded north on I-495 then I-95.  At approximately 5:15 p.m., the RDX travelled into New Hampshire.  Approximately 15 minutes later, the RDX entered Maine.

115.    At approximately 6:35 p.m., investigators were able to establish physical surveillance of the RDX in the area of Brunswick, Maine on I-295.  Investigators were able to observe ARIAS driving the RDX.  Investigators were also able to observe a passenger in the RDX but could not identify the individual.  Investigators continued to monitor the GPS data for the RDX.  At approximately 7:50 p.m., the RDX arrived at 75 Lincolnville Road, the address believed to be used by this DTO to traffic drugs in Maine as described above.  Video footage from a covert

---

[14] On April 17, 2024, investigators had identified Target Location 2 while surveilling Madura Guerrero transport suspected drug proceeds she had packaged at Apartment #1158.

camera also showed the RDX arriving and parking at 75 Lincolnville Road. At approximately 8:30 p.m., video footage showed a vehicle arrive at 75 Lincolnville Road and depart 15 minutes later. At approximately 8:53 p.m., the RDX departed from 75 Lincolnville Road and drove to 179 Lincolnville Road, Belmont, Maine ("179 Lincolnville Road") an address investigators tracked another DTO vehicle to on multiple occasions on July 1, 2024. The RDX arrived at 179 Lincolnville Road at approximately 8:57 p.m. At approximately 9:07 p.m., the RDX arrived at 247 Troy Center Road, another location described above from which members of this DTO traffic drugs, as described above. At approximately 10:07 p.m., the RDX departed from 247 Troy Center Road. At approximately 10:22 p.m., the RDX continued onto I-95 south. At approximately 11:58 p.m., the RDX tracker location showed the RDX to be in Portland, Maine.

116.    The following day, BAEZ GUERRERO posted on his Instagram Account a video of him in the passenger seat inside a moving vehicle on a two-lane roadway during the evening hours of July 28, 2024. BAEZ GUERRERO posted another story from the early morning hours of July 29, 2024 that showed him in the driver's seat of an SUV that investigators recognized as consistent with the interior of an RDX. Based on this social media activity, and the fact that investigators were able to identify ARIAS in the RDX but not the passenger during the evening hours of July 28, 2024, investigators believe that BAEZ GUERRERO was the passenger. Based on experience and training and the patterns of this DTO, investigators further believe that ARIAS and BAEZ GUERRERO had driven from addresses in Massachusetts associated with the DTO described above, including Target Location 2, to 75 Lincolnville Road and 247 Troy Center Road in Maine for the purpose of transporting narcotics or narcotics proceeds.

*On August 12-13, 2024, CASTILLO Transported $1,000 in*
*Suspected Narcotics Proceeds from Maine to Massachusetts.*

117.    On August 12, 2024, investigators were monitoring the location data for the 7277

Phone, used by CASTILLO.   At approximately 9:45 p.m., location data showed the 7277 Phone

departed the area around of 500 Broadway.  The 7277 Phone proceeded north into New Hampshire,

then into Maine.  On August 13, 2024, at approximately 1:12 a.m., the 7277 Phone arrived within

the area of 75 Lincolnville Road.  Investigators had previously installed a pole camera outside this

address.  Investigators reviewed footage from that pole camera for the time period when the 7277

Phone arrived in the area.   Investigators observed a sedan, consistent in appearance with

CASTILLO's BMW sedan described below, arrive at 75 Lincolnville Road.  As described above,

investigators had identified 75 Lincolnville Road as a location from which this DTO traffics

narcotics while in Maine.  Based on experience and training, investigators believe that CASTILLO

drove from 500 Broadway to 75 Lincolnville Road to deliver narcotics for sale in Maine.

118.    On August 13, 2024, at approximately 8:46 p.m., the location data for the 7277

Phone showed that the phone was moving south along I-95 from Maine towards Massachusetts.

Investigators attempted to establish physical surveillance of CASTILLO and his vehicle using the

location data from the 7277 Phone.  At approximately 10:37 p.m., investigators were able to locate

a black BMW sedan, bearing Massachusetts registration 4HKD56, registered to CASTILLO at 45

Oakwood Avenue, Lawrence, Massachusetts, the building in which Target Location 1 is located.[15]

Investigators had observed CASTILLO driving this BMW sedan on previous occasions.  During

this surveillance, the general location for the 7277 Phone tracked the location of the BMW sedan.

---

[15] At some point after August 13, 2024, the registration for CASTILLO's black BMW sedan changed to 51 Wilcock
Street, Apartment 2, Boston, Massachusetts 02124, the address for Target Location 2.

119.     Based on the belief that CASTILLO would be transporting narcotics proceeds in the black BMW sedan, investigators coordinated with NHSP to conduct a motor vehicle stop of CASTILLO's BMW sedan.  At approximately 10:59 p.m., NHSP troopers conducted a motor vehicle stop of CASTILLO's BMW sedan.  Investigators identified CASTILLO as the driver. There were no other occupants of the vehicle.  During the traffic stop, a narcotics-trained police K-9 alerted to the odor of narcotics from the vehicle.  Investigators towed the black BMW sedan to the NHSP barracks and searched it.  During the search, investigators found approximately $1,000 in cash in the center console of the vehicle.  A narcotics-trained police K-9 alerted to the odor of narcotics on the currency.  Investigators also found several money remitter receipts in the vehicle, including a receipt from MONTERO for $1,000 from August 11, 2024.  Investigators also found an Xfinity bill and a Chase banking summary listing CASTILLO as the account holder.  The Xfinity bill listed Target Location 2 as the account address.  Investigators also found CASTILLO's Dominican passport.  Based on experience and training, CASTILLO's travel from Massachusetts to Maine and back in the direction of Massachusetts, his use of an identified drug stash location in Maine, and the positive K-9 alert to the odor of narcotics on the currency, investigators believe this $1,000 were the proceeds from narcotics sales.

*On August 18-19, 2024, the CW Communicated with MENDEZ HERRERA* ▆▆▆▆▆▆▆ *about Drug Trafficking.*

120.     Prior to August 11, 2024, at investigators' direction, the CW communicated to MENDEZ HERRERA that the CW was interested in having someone from MENDEZ HERRERA's DTO transport fentanyl from Massachusetts up to Maine to sell directly to one of the CW's customers.  On August 11, 2024, in a preserved message, MENDEZ HERRERA provided the CW with phone number 781-710-3503 (the "3503 Phone").  In lightly coded

language, MENDEZ HERRERA told the CW that the 3503 Phone was the number for one of his drug couriers who transports narcotics to Maine.   On August 21, 2024, as described below, investigators identified the user of the 3503 Phone as ████████████

121.   On August 19, 2024, at approximately 1:22 p.m., the CW had a WhatsApp call with ████████████ using the 3503 Phone.   This call was recorded but has not been translated.   The CW provided a summary to investigators.   In the call, ████████████ explained that he was going to Maine either that day (August 19) or the next day (August 20).   In lightly coded language, ████████████ old the CW that he could pick up the drugs from the CW and bring them to Maine when he went to Maine to see Chachi (MENDEZ HERRERA).   The CW asked about the cost of the transport.   ████████████ stated he would charge the CW $1,000 to transport 750 grams of narcotics.   The CW could overhear ████████████ speaking with someone else and discussing how much to charge the CW for the transport of the CW's narcotics.   The CW stated that the CW would text ████████████ when the CW's drugs were ready for pickup.   ████████████ confirmed and stated that he would be in the Lawrence area.

122.   On August 19, 2024, at approximately 1:50 p.m., the CW called MENDEZ HERRERA.   This call was recorded but has not been translated.   The CW provided a summary to investigators.   In lightly coded language, MENDEZ HERRERA explained that the drug courier (referring to ████████████ would not be driving to Maine that day (August 19).   MENDEZ HERRERA stated that another courier would drive 200 grams of narcotics up to Maine, pick up $15,000, and bring the money back to Massachusetts.   MENDEZ HERRERA stated that for such a small quantity of narcotics, 200 grams, he did not need to use the vehicle with the "trap," or hidden compartment inside.   MENDEZ HERRERA stated that because the courier had a "trap" in his vehicle, he would be transporting one kilogram of cocaine the following day up to Maine.

Based on experience and training, investigators know that drug traffickers often purchase after-market modifications on their vehicles to create secret compartments in which to hide narcotics and narcotics proceeds, called "traps" or "hides."

123.   While MENDEZ HERRERA was speaking to the CW over one of his phones, MENDEZ HERRERA received a phone call on one of his other phones.   MENDEZ HERRERA put that second call on speaker and the CW heard MENDEZ HERRERA and the other caller, a person the CW recognized as "Wilton," discuss the purchase of "arriba," meaning cocaine. MENDEZ HERRERA told "Wilton" that MENDEZ HERRERA had someone in Boston who could supply the "arriba" to Wilton for $21,000 per kilogram.   After finishing his conversation with "Wilton," MENDEZ HERRERA told the CW that the CW could communicate directly with the courier about buying crystal methamphetamine.   MENDEZ HERRERA then stated that his cousin was coordinating for the purchase of one kilogram of cocaine for that night (August 19). The courier would then transport the kilogram of cocaine up to Maine the following day (August 20).   Based on experience and training, the recorded calls with ▓▓▓▓▓ and MENDEZ HERRERA, investigators believed that ▓▓▓▓▓ would be transporting narcotics to Maine using a vehicle with a "trap" inside to hide the narcotics.

124.   On August 19, 2024, at approximately 9:58 p.m., the CW called MENDEZ HERRERA.   This call was recorded but has not been translated.   The CW provided a summary to investigators.   In lightly coded language, MENDEZ HERRERA explained that the courier with the "trap" in his vehicle ▓▓▓▓▓ would travel to Maine on August 21, 2024.   MENDEZ HERRERA and the CW then discussed the timing of ▓▓▓▓▓ planned trip to Maine. MENDEZ HERRERA then explained that he was out of cocaine and missed out on a sale because he did not have drugs to sell.   MENDEZ HERRERA discussed prices with the CW for both

45

fentanyl and cocaine.  MENDEZ HERRERA also stated that he used different drug couriers.  One courier charged $700 to bring narcotics to Maine, while another charged $1,000.  Based on experience and training, investigators believe that MENDEZ HERRERA had arranged for ▇▇▇▇▇▇ o bring drugs from Massachusetts to Maine on August 21, 2024.

*On August 19-20, 2024, REYNOSO Traveled To and From Maine and Met with ARIAS at the Target Location 1 Building After Returning to Massachusetts.*

125.     On August 19, 2024, investigators were monitoring the court-authorized GPS tracker information for the grey CRV.  Investigators had observed members of the DTO driving this vehicle as described above.  In the morning and afternoon of August 19, 2024, the grey CRV traveled around the city of Boston.  Then, the grey CRV headed north into New Hampshire and Maine.  At approximately 5:58 p.m., the grey CRV exited from I-95 into Augusta, Maine.  The grey CRV then traveled directly to 75 Lincolnville Road, arriving at approximately 6:40 p.m.  At approximately 8:09 p.m., the grey CRV departed from 75 Lincolnville Road and traveled south to 179 Lincolnville Road, arriving at 8:10 p.m.  As described above, investigators had identified 179 Lincolnville Road as an address from which this DTO traffics narcotics.  At approximately 8:21 p.m., the grey CRV departed from 179 Lincolnville Road and drove back to 75 Lincolnville Road, arriving at approximately 8:22 p.m.  At approximately 9:08 p.m., the grey CRV departed 75 Lincolnville Road and travelled south toward I-95.  From 9:50 p.m. to 10:02 p.m., the grey CRV stopped at a gas station in Augusta, Maine.  At approximately 10:02 p.m., the grey CRV continued south on I-95 towards Massachusetts.

126.     At approximately 11:46 p.m., investigators were able to establish physical surveillance of the grey CRV as it travelled southbound on I-95 in York, Maine.  Investigators maintained surveillance as the vehicle traveled straight to area of Target Location 1, arriving on

August 19, 2024, at approximately 12:24 a.m. At approximately 12:27 a.m., investigators observed REYNOSO exit from the driver's seat of the grey CRV and walk into the rear outer entrance of the building in which Target Location 1 is located (the "Target Location 1 Building"). At approximately 12:37 a.m., investigators observed REYNOSO exit the same rear entry door of the Target Location 1 Building, walk to the grey CRV, enter the driver's seat, and depart the area. REYNOSO, in the grey CRV, drove directly to 438 Geneva Avenue in Dorchester, Massachusetts. At approximately 1:23 a.m., investigators observed REYNOSO arrive at 438 Geneva Avenue and enter the building.

127. Prior to REYNOSO's arrival at the Target Location 1 Building, investigators were monitoring the court-authorized location data for the 2952 Phone, used by ARIAS. The location data showed the 2952 Phone had been in the area of Target Location 1 prior to REYNOSO's arrival and remained in the area after REYNOSO's departure. Additionally, the 2008 Accord, described above, registered to ARIAS was parked near Target Location 1 at the time of REYNOSO's visit.

128. At approximately 1:21 a.m., investigators observed ARIAS open the same rear door to the Target Location 1 Building that REYNOSO had used to enter and exit the building. ARIAS was holding a young baby and was joined by an adult female in the doorway. At approximately the same time, investigators observed a white Honda CRV, bearing Massachusetts registration 5CHG81, arrive in the area of the Target Location 1 Building and park near the rear entry door. Investigators observed an unknown male ("UM-3") walk from the driver's seat of the white Honda CRV and enter the Target Location 1 Building through the rear entry door. At approximately 1:22

a.m., investigators observed UM-3 exit the Target Location 1 Building carrying an opened box which he placed in the white Honda CRV and drove away from the area.

129.    Based on experience and training, REYNOSO's travel to and from Maine in one night, and his meeting with ARIAS, investigators believe that REYNOSO transported narcotics proceeds from Maine back to Massachusetts and handed them off to ARIAS at Target Location 1.[16]

*On August 21, 2024, Investigators Seized Methamphetamine, Cocaine, and Two Firearms from ▮▮▮▮▮▮▮▮▮▮▮▮▮ and MENDEZ HERRERA*
*Discussed Drug Transportation with the CW.*

130.    Based on the recorded conversations between MENDEZ HERRERA, ▮▮▮▮▮▮▮ and the CW described above, investigators believed that ▮▮▮▮▮▮ would be transporting narcotics from Massachusetts to Maine in a vehicle containing a hidden "trap." Additionally, at investigators' direction, the CW asked ▮▮▮▮▮▮ to pick up purported narcotics and transport them to Maine on the CW's behalf. Additionally, on June 6, 2024, while conducting surveillance of CASTILLO, ARIAS, and others in the area of 500 Broadway, investigators had observed a white 2015 Nissan Rogue, bearing Massachusetts registration 2CBR13, with a registered address of 128 Maple Street, Apartment #1, Lynn, Massachusetts (the "Rogue"), in the area. Investigators had identified the Rogue as a vehicle potentially used to

---

[16] Additionally, prior to these observations, the CW had been in regular communication with MENDEZ HERRERA. MENDEZ HERRERA stated that he was having money transported down from Maine to Massachusetts so that he could obtain additional drugs in Massachusetts and have them brought back to Maine. That information was corroborated by the seizure of methamphetamine and cocaine from ▮▮▮▮▮▮▮ on August 21, 2024, described below.

transport narcotics.  Based on this information and experience and training, investigators had placed an alert on the license plate for the Rogue to attempt to track its movements.

131.   During the morning of August 21, 2024, the CW and ████████ exchanged multiple WhatsApp text messages, voice calls, and voice notes.  At approximately 5:53 a.m., ████████ using the 3503 Phone, sent a WhatsApp message stating, "What time are you going to be ready because I am going up there[?]"  Based on experience and training, investigators believe that ████████ was asking the CW when the CW would have drugs ready for transport because ████████ was planning to drive to Maine ("up there").  During these message and call exchanges, the CW was in contact with investigators and was relaying the content of these communications.

132.   At approximately 6:07 a.m., ████████ old the CW that he was getting ready and would come to the "L," meaning Lawrence, and that he would wait for the CW to get drugs if necessary.  Investigators directed the CW to delay ████████ by stating that the CW was delayed in picking up drugs.

133.   At approximately 6:56 a.m., investigators received an alert that the Rogue was traveling northbound on I-93 in the Lawrence area.  At approximately 7:32 a.m., ████████ sent a voice note to the CW stating that he was waiting at the restaurant Pollo Tipico for it to open.  Investigators are familiar with the Pollo Tipico restaurant located at 190 Lawrence Street, Lawrence, Massachusetts.  The CW informed investigators that Pollo Tipico did not open until 8:00 a.m. and that if ████████ was waiting in the parking lot, he would likely be the only customer there.  Investigators drove to the Pollo Tipico to establish physical surveillance.  Once at the restaurant, investigators identified the Rogue in the parking lot and identified a male seated in the driver's seat.  Investigators later identified this male as ████████

49

134.    At approximately 7:55 a.m., investigators observed ▇▇▇▇▇▇ exit the driver's seat of the Rogue. ▇▇▇▇▇▇▇ walked to the entrance to Pollo Tipico while actively speaking on his cell phone. ▇▇▇▇▇▇ turned around and walked to Pollo Ciabo, another restaurant, located at 157 Lawrence Street.

135.    At approximately 8:01 a.m., MENDEZ HERRERA called the CW.  This call was not recorded.  The CW relayed the substance of the communication to investigators.  MENDEZ HERRERA asked about the status of the CW's drug pickup.  At investigators' direction, the CW stated that the CW had not yet been able to pick up the drugs to provide to ▇▇▇▇▇▇ However, the CW explained that the CW's purported drug customer in Maine needed to know MENDEZ HERRERA's location once the CW was able to pass off the drugs to ▇▇▇▇▇▇ for transport.  MENDEZ HERRERA sent the CW a pin location for 75 Lincolnville Road.  Additionally, location data for the 2153 Phone, used by MENDEZ HERRERA, showed the phone was located in the area of 75 Lincolnville Road.  As described above, investigators have identified this address as a likely stash location for narcotics used by this DTO.

136.    At approximately 8:11 a.m., investigators observed ▇▇▇▇▇▇ walk out of Pollo Ciabo toward the Rogue and then back to Pollo Tipico.  Investigators observed ▇▇▇▇▇▇▇ place something in the Rogue and walk to Pollo Tipico.  At approximately 8:23 a.m., investigators observed ▇▇▇▇▇▇ return to the Rogue and enter the driver's seat.

137.    At approximately 8:18 a.m., MENDEZ HERRERA, using the 2153 Phone, called the CW.  This call was recorded.  MENDEZ HERRERA stated that "the boss" was waiting for the drug shipment and the courier ▇▇▇▇▇▇ would only wait another 10 – 12 minutes for the CW to provide the CW's drug shipment.  In lightly coded language, MENDEZ HERRERA stated that the courier ▇▇▇▇▇▇ had already picked up drugs that morning that he needed to deliver

50

to Maine.  At investigators' direction, the CW informed MENDEZ HERRERA that the CW still had not been able to pick up drugs for transport.

138.    Starting at approximately 8:37 a.m., the CW exchanged a series of messages with ████████, using the 3503 Phone.  At investigators' direction, the CW stated that the CW could not get the drugs that morning.  The CW then told ████████████ should go to Maine without the CW's drugs, because the CW did not want to waste any more of ████████ time.  At approximately 8:48 a.m., ████████ acknowledged that he would go to Maine.

139.    At approximately 8:50 a.m., investigators observed ████████ ull the Rogue out of the Pollo Tipico parking lot.  After stopping at a gas station, ████████ using the 3503 Phone, sent another text message to the CW explaining that he was leaving.  At approximately 8:56 a.m., investigators observed the Rogue exit the gas station and travel towards I-495. Investigators maintained surveillance on the Rogue as it continued onto I-95 into New Hampshire. Investigators contacted NHSP and requested NHSP conduct a motor vehicle stop of the Rogue.

140.    At approximately 9:23 a.m., NHSP troopers stopped the Rogue.  They identified ████████ as the driver by his Massachusetts driver's license.  Troopers found ████████ in possession of one cellular phone and $1,000 cash.  ████████ told troopers his phone number was the phone number assigned to the 3503 Phone.  A trooper placed a phone call to the 3503 Phone while it was in the trooper's possession.  ████████ cellular phone, the 3503 Phone, rang. Based on experience and training, and the transportation fees discussed above, investigators believed this $1,000 was a transportation fee for ████████ to drive narcotics to Maine.

141.    ▮▮▮▮▮▮ provided consent to search the Rogue.  While searching the Rogue, troopers found evidence of a "trap" in the vehicle and towed the vehicle to a state police barracks to continue the search.  Troopers used an X-ray scanning device to check for the "trap."  Troopers found a brick-like object in the interior of the vehicle inside the likely "trap."  Investigators were able to access the "trap" by cutting through a speaker box in the Rogue.  Inside the "trap," investigators found a brick-like object wrapped in bright green tape and further wrapped in a black t-shirt.  Investigators peeled back some of the wrapping to reveal two white, compressed powder bricks, consistent in appearance with cocaine.  Investigators conducted a field test of the bricks which revealed a positive result for cocaine.  The substance was sent to the DEA laboratory for testing which confirmed the presence of cocaine and a total drug weight of 622 grams.  Investigators also found two one-gallon Ziplock baggies containing a broken crystalline substance, consistent in appearance with methamphetamine.  Lab results also confirmed that the methamphetamine was 98% pure.  The substance was sent to the DEA laboratory for testing which confirmed the presence of methamphetamine and a total drug weight of 897 grams.

142.    Investigators also found two firearms within the "trap," a .380 caliber Glock 42 handgun and a .380 caliber Taurus, both with a magazine containing one round of ammunition loaded into the magazine wells.  Investigators were also able to determine how this "trap" was operated – through a series of wires connected to a mechanical piston on the side of the "trap."[17]

---

[17] In follow-up communications between MENDEZ HERRERA and the CW, in lightly coded language, MENDEZ HERRERA told the CW that the police had seized the drugs from the courier.

*On August 29, 2024, MENDEZ HERRERA Coordinated with the CW*
*for the Transport of One Kilogram of Sham Fentanyl to Maine;*
*CANELA SOTO Transported the Sham Fentanyl to Maine.*

143.    In the days leading up to August 29, 2024, investigators were attempting to identify other vehicles containing "traps" used by the DTO to transport narcotics from Massachusetts to Maine.  At investigators' direction the CW negotiated with MENDEZ HERRERA for the transport of fentanyl (sham provided by investigators) from Massachusetts to Maine using a courier from MENDEZ HERRERA's DTO.  MENDEZ HERRERA provided the CW with the phone number 857-381-3309 (the "3309 Phone"), and in lightly coded language, identified the user of the 3309 Phone as a courier.  As described below, investigators identified CANELA SOTO as the user of the 3309 Phone.

144.    On August 29, 2024, the CW exchanged multiple communications with CANELA SOTO, using the 3309 Phone, and MENDEZ HERRERA, to arrange for the pickup of the sham fentanyl and subsequent transportation to Maine.   These communications were recorded and preserved, but have not yet been translated.  The CW communicated the substance of these communications to investigators.

145.    On August 29, 2024, at approximately 11:09 a.m., CANELA SOTO, using the 3309 Phone, sent the CW a text messages stating, "I'm ready for 2:00 p.m."  At approximately 11:30 a.m., the CW spoke with CANELA SOTO.  In lightly coded language, CANELA SOTO stated that he would deliver the CW's drugs to the Portland, Maine area, rather than the area where MENDEZ HERRERA was located, which was farther into Maine.  CANELA SOTO explained that he usually charged MENDEZ HERRERA $800 for each narcotics transport and that CANELA SOTO regularly brought 50 grams of fentanyl and three ounces of methamphetamine with him during trips into Maine.

53

146.     At approximately 1:11 p.m., the CW received a call from MENDEZ HERRERA. At investigators' direction, in lightly coded language, the CW told MENDEZ HERRERA that the CW would pay him $500 for facilitating the drug transport.  The CW also told MENDEZ HERRERA that one of the CW's drug customers (an officer acting in an undercover capacity, the "UC") would pick up a sample of crystal methamphetamine from MENDEZ HERRERA and pay MENDEZ HERRERA the $500 facilitation fee.  MENDEZ HERRERA agreed and told the CW that he would send the CW a picture of the available crystal methamphetamine for sale at the price of $400 per ounce.  At approximately 1:17 p.m., MENDEZ HERRERA sent the CW a picture of glass-like shards inside a plastic bag that was consistent in appearance with methamphetamine.

147.     On August 29, 2024, starting at 2:22 p.m., the CW and CANELA SOTO exchanged a series of text messages with locations and times to coordinate their meeting to pick up the CW's sham fentanyl.

148.     Prior to the planned meeting with CANELA SOTO, investigators met with the CW at a predetermined location.  Investigators searched the CW and the CW's vehicle for contraband and currency with negative results.  Investigators provided the CW with a kilogram of sham fentanyl and $1,000 in official authorized funds ("OAF") for the transportation fee.  Investigators equipped the CW with an audio/video recording device.  Investigators then surveilled the CW as the CW drove to the planned meeting location.  Investigators established surveillance around the planned meeting location.

149.     At approximately 3:27 p.m., the CW received a text message from CANELA SOTO which stated, "Be there in 5, there is a lot of traffic."  The CW and CANELA SOTO continued to exchange text messages regarding the timing and location of the meeting.  At approximately 3:39 p.m., investigators observed a white 2020 Acura TLX, bearing Massachusetts registration PS748N,

Vehicle Identification Number ("VIN") 19UUB2F44LA002030, registered to Edward Soto-Perez, at 1841 Columbus Avenue, Apartment 3A, Roxbury, Massachusetts 02119 (the "white Acura"), pull into the parking lot of the meeting location. After the white Acura parked, investigators observed CANELA SOTO exit the white Acura and enter the CW's vehicle. Investigators were also able to observe a man later identified as Raldy Diaz sitting in the front passenger seat of the white Acura. While inside the CW's vehicle, the CW handed CANELA SOTO the kilogram of sham fentanyl and the $1,000 of OAF. As recounted to investigators after the meeting, the CW relayed that CANELA SOTO had access to another vehicle with a "trap," a Honda CRV. The CW told CANELA SOTO to deliver the fentanyl to the Maine Mall in South Portland, Maine. CANELA SOTO then exited the CW's vehicle with the sham fentanyl and $1,000, entered the white Acura, and departed the area. Investigators maintained surveillance on the white Acura and the CW's vehicle.

150.    The CW drove back to a predetermined location to meet with investigators. Investigators collected the audio/video recording device and searched the CW and the CW's vehicle for contraband and currency with negative results.

151.    CANELA SOTO drove the white Acura to a nearby gas station. At approximately 3:52 p.m., CANELA SOTO, using the 3309 Phone, sent a text message to the CW asking for the delivery address. The CW responded with the address for the Maine Mall in South Portland, Maine. Investigators continued to surveil the white Acura as it drove to Lawrence. At approximately 4:10 p.m., the white Acura pulled over. An unknown man ("UM-4") was in a grey SUV parked near the white Acura. Diaz got out of the white Acura and passed an item to UM-4. The item did not appear to be the kilogram of sham fentanyl the CW had provided.

152.    Investigators continued to follow the white Acura as it drove north on I-95 into New Hampshire then Maine.  At approximately 5:22 p.m., CANELA SOTO called the CW and told the CW that CANELA SOTO was seven minutes away from the Maine Mall meeting location with the CW's customer.

153.    The UC was prepared to act as the CW's customer to receive the kilogram of sham fentanyl.  The UC was equipped with an audio/video recording device.  The CW and CANELA SOTO continued to exchange communications with text and photos of CANELA SOTO's location and the UC's location so that CANELA SOTO could find the UC in the parking lot of the meeting location.

154.    At approximately 5:40 p.m., the UC observed CANELA SOTO park the white Acura next to the UC's vehicle on the passenger side.  CANELA SOTO, using the 3309 Phone, was on an active call at that time with the CW and the UC observed CANELA SOTO speaking on his cellular phone.  The UC observed Diaz in the front passenger seat of the white Acura.  Diaz bent forward, reached under the seat, and retrieved an object wrapped in a bath towel.  Diaz then handed this object to CANELA SOTO.  CANELA SOTO exited his vehicle and entered the front passenger seat of the UC's vehicle.  CANELA SOTO unwrapped the item and revealed the kilogram of sham fentanyl provided to him earlier by the CW.  The UC showed CANELA SOTO a serial number for a dollar bill that the UC had written on his hand which corresponded to a dollar bill wrapped in the kilogram of sham fentanyl.  CANELA SOTO checked the serial number on the dollar bill in the kilogram of sham fentanyl and confirmed they matched.  CANELA SOTO then handed the sham fentanyl to the UC.  CANELA SOTO then exited the UC's vehicle and got back into the driver's seat of the white Acura.  CANELA SOTO drove away from the parking lot and headed south on I-95.

155.    Investigators continued to maintain surveillance of the white Acura. Investigators asked the NHSP to conduct a motor vehicle stop of the white Acura to fully identify the driver and passenger. Troopers conducted a motor vehicle stop and identified the driver as CANELA SOTO and the passenger as Diaz. Both men had pictures of their driver's licenses on their cellular phones, which the troopers used to identify the men.[18]

*On September 6, 2024, ARIAS and BAEZ GUERRERO Transported Suspected Narcotics Proceeds from Maine to Target Location 1.[19]*

156.    On September 6, 2024, investigators were monitoring the location information for the 2952 Phone, used by ARIAS. Starting at 9:06 a.m., the location data showed that the 2952 Phone was located in Waldo County, Maine, the area in Maine in which this DTO regularly stores and distributes its narcotics. At approximately 12:16 p.m., location data for the 2952 Phone showed the phone moving toward I-95 and then south toward New Hampshire and then Massachusetts. Investigators attempted to locate ARIAS's vehicle along I-95.

---

[18] On August 28, 2024, at 5:22 p.m., the CW contacted CANELA SOTO. In lightly coded language, CANELA SOTO stated that he was on his way up to see Chachi (MENDEZ HERRERA). The CW believed that during this phone call, CANELA SOTO was in a vehicle. On August 29, 2024, at 12:20 a.m., license plate reader showed the white Acura was on I-95 southbound to Massachusetts. Based on the timing of the phone call between CANELA SOTO and the CW and the southbound license plate reader hit, investigators believe that CANELA SOTO drove the white Acura up to Maine to provide narcotics to MENDEZ HERRERA then returned to Massachusetts later that night. License plate reader data showed the white Acura crossed from New Hampshire to Massachusetts during the following dates and times: 10/7/24 11:09 p.m.; 10/1/24 1:37 a.m.; 9/28/24 10:58 p.m.; 9/22/24 11:14 p.m.; 9/21/24 1:18 a.m.; 9/20/24 1:17 a.m.; 9/17/24 8:26 p.m.; 9/16/24 1:34 a.m.; 9/5/2024 3:03 a.m.; 8/31/2024 3:46 a.m.; and 8/29/24 6:47 p.m. Based on the frequency of these trips and the established patterns of this DTO, investigators believe that CANELA SOTO regularly used the white Acura to transport narcotics from Massachusetts to Maine.

[19] On September 5, 2024, management for the Strata Apartment Complex, in which Apartment #1158 was located, notified investigators that the residents of the apartment had moved out and vacated Apartment #1158. Based on the observations described after that date in this affidavit, investigators believe that the DTO moved at least part of its operations to Target Locations 1 and 2 after they no longer had access to Apartment #1158.

157.    At approximately 2:50 p.m., investigators located a black 2023 Nissan Rogue, bearing New York registration LEX8997.  Investigators had previously observed this vehicle while conducting surveillance in in Seabrook, New Hampshire on August 27, 2024.  The location information for the 2952 Phone showed that the phone was traveling in the same direction and in the same area as the Nissan Rogue.  Based on the location data for the 2952 Phone and the Nissan Rogue's movements, investigators believed that ARIAS was in the Nissan Rogue.

158.    Investigators continued to surveil the Nissan Rogue as it drove south on I-95, exited onto I-495, and exited the highway in the Lawrence, Massachusetts area.  The Nissan Rogue continued to travel directly to the area of the Target Location 1 Building.

159.    At approximately 3:30 p.m., investigators observed the Nissan Rogue parked in the area of the Target Location 1 Building.  Investigators observed BAEZ GUERRERO exit from the driver's seat of the vehicle and ARIAS exit from the vehicle.  BAEZ GUERRERO and ARIAS then walked away from the vehicle towards rear entry door of the Target Location 1 Building.  As ARIAS walked, he continually pulled up his sweatpants.  When walking up the stairs, investigators observed a large rectangular bulge in his sweatpants.  Investigators could observe what appeared to be a large quantity of U.S. currency tucked into ARIAS's pocket.  At approximately 3:34 p.m., both ARIAS and BAEZ GUERRERO entered the rear door of the Target Location 1 Building.  Investigators observed ARIAS's 2008 Accord parked in the vicinity of the Target Location 1 Building.

160.    At approximately 3:46 p.m., investigators observed ARIAS exit the rear door of the Target Location 1 Building, walk to his Honda Accord, open the Accord's door, then walk back to the Nissan Rogue.  ARIAS then returned to the 2008 Accord and drove away from the area.

58

When ARIAS exited the Target Location 1 Building, investigators did not see him pulling up his pants or carrying anything.

161.    At approximately 4:09 p.m. investigators observed BAEZ GUERRERO exit the rear door of the Target Location 1 Building, walk to the Nissan Rogue, enter the driver's seat, and drive away from the area.  Based on ARIAS and BAEZ GUERRERO's travel from Maine to the Target Location 1 Building, the observations of the large amount of currency in ARIAS's pants when he entered the Target Location 1 Building, and the patterns and practices of this DTO, investigators believe ARIAS and BAEZ GUERRERO were transporting narcotics proceeds from Maine to Target Location 1.

*On September 12, 2024, Investigators Seized a Mixture of Fentanyl and Cocaine from REYNOSO and LARA ARIAS During a Traffic Stop after They Departed from Target Location 1.*

162.    On September 12, 2024, investigators were monitoring the court-authorized GPS tracker information for the grey CRV, described above.  At approximately 8:45 a.m., the grey CRV left the area of 438 Geneva Avenue, Dorchester, Massachusetts.  As described above, on August 19, 2024, investigators observed REYNOSO drive from Maine to this address after meeting with ARIAS at the Target Location 1 Building.

163.    GPS tracking data showed the grey CRV arrived in the area of the Target Location 1 Building at approximately 9:47 a.m.  The vehicle remained in the area for approximately 11 minutes. Tracking data for the grey CRV showed that it drove to the Gomez Market in Lawrence and then a gas station in Methuen.  At approximately 10:15 a.m., the grey CRV began traveling north on I-495 and eventually continued traveling north to I-95.  Investigators were able to establish physical surveillance of the grey CRV in the area of Seabrook, New Hampshire. Investigators observed REYNOSO driving the grey CRV and observed a passenger in the front

passenger seat but could not identify the passenger at the time. As described below, the passenger was later identified as LARA ARIAS.

164.    Investigators requested the NHSP conduct a motor vehicle stop of the grey CRV. NHSP troopers conducted the traffic stop at approximately 10:41 a.m. When the trooper approached the vehicle, he observed white powder residue on the front passenger seat and the carpet under the front passenger seat. The trooper also observed spilled milk on the floor. The trooper ordered the men out of the vehicle. The driver was identified as REYNOSO. The passenger was identified as LARA ARIAS. The troopers searched the vehicle and found a metal tin with milk inside along with multiple opened plastic bags that contained powder residue. Additionally, troopers found a plastic bottle containing purple powder. Investigators field tested the powder with negative results. As described in multiple prior affidavits, when being pulled over, members of this DTO regularly combine narcotics, usually fentanyl, with milk inside a container in an effort to destroy the narcotics. The powder and spilled milk on the floor of the grey CRV is consistent with this practice. Additionally, investigators have seized purple powder containing fentanyl from this DTO on prior occasions as described above and believe the DTO often mixes this purple powder with fentanyl to brand its product. Both the purple powder and the milk mixture have been sent to the DEA laboratory for testing. The test results for the purple powder showed that it did not contain controlled substances. The test results for the milk / powder mixture showed the presence of fentanyl and cocaine with a total drug weight of 2,778 grams. Investigators swabbed LARA ARIAS's hands. The swabs were sent to the DEA laboratory for testing and tested positive for fentanyl and cocaine.[20]

---

[20] On at least two occasions, while monitoring BAEZ GUERRERO's Instagram account, investigators have viewed video stories which showed BAEZ GUERRERO with LARA ARIAS. Additionally, on August 23, 2024, investigators

165.     During the stop, REYNOSO identified his phone number as the phone number 857-398-5646 (the "5646 Phone").  During the stop, LARA ARIAS identified his phone number as the "7749 Phone").  Toll analysis shows that the 7749 Phone, used by LARA ARIAS, has been in contact with the following phones in the past 60 days: the 8738 Phone, used by MENDEZ HERRERA, approximately seven times on September 9, 2024; the 5646 Phone, used by REYNOSO, approximately three times from September 13 through 20, 2024, and the 8005 Phone, used by BAEZ GUERRERO, approximately two times, from August 26, 2024 to October 6, 2024.

*On October 10, 2024, BAEZ GUERRERO Transported Suspected
Narcotics Proceeds from Maine to Target Location 1.*

166.     On October 10, 2024, investigators viewed a WhatsApp story posted via WhatsApp from the 2952 Phone, used by ARIAS.  The story showed a white Jeep parked in the driveway of 10 Resh Road, Searsport, Maine.[21]  The operator of the Jeep was later identified as BAEZ GUERRERO.  Investigators believed that the Jeep would head south from Maine to Massachusetts. Investigators established surveillance along I-95 at the border of Maine and New Hampshire.

---

conducted a motor vehicle stop of a vehicle used by the DTO traveling southbound on I-95 in New Hampshire. The purpose of this stop was solely to identify the vehicle's occupants.  The driver was identified as BAEZ GUERRERO. LARA ARIAS was identified as one of the passengers.  The vehicle was not searched.

[21]  Through interviews with multiple sources of information, Maine Drug Enforcement Agency investigators have identified this location as the residence of a narcotics trafficker, Cameron Philbrook.  Multiple sources of information stated to investigators that Philbrook received his drugs from a Dominican male named "Chachi."  On August 18, 2024, GPS tracking information showed that the grey CRV traveled directly from Boston, Massachusetts to 247 Troy Center Road, in Troy, Maine and then on to 10 Resh Road in Searsport.  The grey CRV arrived at 10 Resh Road at approximately 1:10 a.m. and departed at approximately 2:43 a.m.  On October 16, 2024, investigators also observed BAEZ GUERRERO park his vehicle at 10 Resh Road for less than an hour and then depart the location.  Based on experience and training, the use of the grey CRV to transport narcotics, and the general pattern of transporting drugs from Massachusetts to Maine, investigators believe that 10 Resh Road is a location from which this DTO distributes narcotics in Maine.

While there, investigators identified a white 2020 Jeep Grand Cherokee, bearing Massachusetts registration 6EGA27, registered to Ludarys Suarez-Zambrana, at of 46-48 Waverly Street, Apartment #5, Roxbury, Massachusetts, traveling southbound on I-95.[22]  Investigators maintained surveillance of this vehicle as it continued driving south directly to the area of the Target Location 1 Building.

167.    Once the Grand Cherokee parked in the area of the Target Location 1 Building, investigators observed BAEZ GUERRERO exit from the driver's seat.  BAEZ GUERRERO then entered the rear door of the Target Location 1 Building.  Approximately 20 minutes later, BAEZ GUERRERO exited the rear door of the Target Location 1 Building, entered the Grand Cherokee, and drove away.

168.    Based on experience and training, the travel from Maine to Massachusetts, and the patterns and practices of this DTO, investigators believe that BAEZ GUERRERO transported narcotics proceeds from Maine to Target Location 1.

**Additional Facts Supporting Probable Cause for the Search of Target Location 1**

169.    On August 27, 2024, investigators were monitoring the Instagram account used by BAEZ GUERRERO.  At approximately 2:48 a.m., a video was posted on this account that showed BAEZ GUERRERO driving a Nissan Rogue, rented by Justo De La Cruz.  Investigators observed three large stacks of U.S. currency on top of the center console in the Nissan Rogue.  Investigators established surveillance on I-95 and located a black 2023 Nissan Rogue, bearing New York

---

[22] On September 10, 2024, investigators had observed this Grand Cherokee being operated by ARIAS in the vicinity of Target Location 1. Additionally, MENDEZ HERRERA's Massachusetts non-driver ID card lists his address as 46-48 Waverly Street, Apartment #5, Roxbury, Massachusetts, the registration address for the Grand Cherokee.  On October 8, 2024, investigators observed the Grand Cherokee parked outside the residence at 46-48 Waverly Street.

registration LEX8997, described above.  The Nissan Rogue was traveling south in the area of Seabrook, New Hampshire on I-95.  Investigators maintained surveillance of the Nissan Rogue as it traveled south directly to the area of the Target Location 1 Building.  Additional investigators also set up surveillance in the area of the Target Location 1 Building.  At approximately 3:48 a.m., investigators observed the Nissan Rogue pull up onto the curb nearest to the rear entrance to the Target Location 1 Building.  At approximately 3:49 a.m., investigators observed ARIAS exit the rear outer door of the Target Location 1 Building.  ARIAS stood by the outer door.  Two individuals exited the Nissan Rogue and entered the Target Location 1 Building with ARIAS, who had opened the outer door for them.  All three men entered the Target Location 1 Building.  At this time, the lights in the first floor, Target Location 1, were on during this interaction.  Inside Target Location 1, an individual separated the window blinds, which appeared to investigators like someone was looking outside Target Location 1.  At approximately 4:15 a.m., investigators observed ARIAS and the same two men from the Nissan Rogue exit the outer rear door of the Target Location 1 Building.  ARIAS remained by the outer rear door.  The two men returned to the Nissan Rogue and drove it away from the area.  After the Nissan Rogue departed, ARIAS re-entered the outer rear door to the Target Location 1 Building.  Two minutes after ARIAS re-entered the Target Location 1 Building, investigators observed the lights in the first floor, Target Location 1, go out.  Based on experience and training, investigators believe that the two men were transporting narcotics proceeds from Maine to Massachusetts and delivered them to ARIAS at Target Location 1.

170.    On September 19, 2024, investigators conducted surveillance in the area of Target Location 1.  At approximately 10:15 p.m., investigators observed the first-floor lights were turned on in Target Location 1.  Investigators observed two adult women in Target Location 1.  One of

the adult women was holding a baby.  Investigators believed the baby the woman was holding was the same size and approximate age of the baby ARIAS was holding at the rear outer door of the Target Location 1 Building on August 20, 2024, at approximately 1:20 a.m.

171.     On September 23, 2024, investigators established surveillance outside the Target Location 1 Building.  At approximately 1:10 p.m., investigators observed ARIAS coming out of the front main entrance to the Target Location 1 Building.  While exiting from the front main entrance, the front interior entrance to Target Location 1 is immediately to the left of the outer front entrance door (see Attachment A-1 photo #1).  ARIAS appeared to be on the side of the exit area where the interior door leading to Target Location 1 is located.  Investigators observed that the interior door to Target Location 1 opens into Target Location 1, consistent with an interior entrance.  Based on experience and training, ARIAS's movements when he exited the Target Location 1 Building, and the proximity of the interior door to Target Location 1, investigators believe ARIAS exited from Target Location 1.

172.     Investigators have observed ARIAS at the rear outer door of the Target Location 1 Building in the late night and early morning hours as described above.  Investigators have also observed ARIAS leaving the building during daytime hours.  Investigators have observed him carrying a baby at that location.  On multiple occasions, investigators have observed ARIAS bringing children into the rear door of the Target Location 1 Building.  Based on these observations and the other observations noted above, investigators believe that ARIAS resides at Target Location 1.

**Additional Facts Supporting Probable Cause for the Search of Target Location 2**

*On August 31, 2024, BAEZ GUERRERO Displayed a Handgun Inside Target Location 2.*

173.    On August 31, 2024, investigators were monitoring a live Instagram story posted by BAEZ GUERRERO.  Investigators recorded this Instagram story.  The story showed BAEZ GUERRERO outside the Target Location 2 Building.  Investigators recognized the exterior of the building's siding, trim color, and door color to be consistent with their prior surveillance operations around Target Location 2.

174.    Using a key, BAEZ GUERRERO entered the outer first-floor entrance into the Target Location 2 Building.  Continuing to view the Instagram story, investigators observed BAEZ GUERRERO enter the outer door and climb a set of stairs to the second floor of the building.  BAEZ GUERRERO used a key to enter the door to Target Location 2.  BAEZ GUERRERO walked into a bedroom inside Target Location 2 and turned on the lights.  He appeared to be speaking, but investigators were not able to hear the audio.  BAEZ GUERRERO then displayed a white iPhone on the story.  BAEZ GUERRERO then reached into a drawer of a dresser or table and pulled out a two-toned handgun.  BAEZ GUERRERO displayed the handgun in the Instagram story.  Investigators could clearly observe that the slide of the handgun was silver, while the pistol grip was black.  BAEZ GUERRERO then displayed a certificate from Yamaha Motor Corporation.

175.    After viewing this Instagram story, investigators reviewed BAEZ GUERRERO's other Instagram posts.  Investigators found a still photo, posted on August 26, 2024, of the same certificate from Yamaha Motor Corporation.  Investigators also observed multiple $100 bills stacked in the same drawer they had viewed in the Instagram story.  Based on the video and still photos and BAEZ GUERRERO's movement from the first floor to access the second floor

apartment, investigators believe the DTO is using Target Location 2, which is on the second floor of the building at 51 Wilcock Street.

*Records of DTO Use of Target Location 2*

176.   Eversource utility records show that the account holder for Target Location 2 is Leydy Guerrero, with a listed phone number of 617-602-2491 (the "2491 Phone").[23]  The 2491 Phone has been listed on recent Enterprise Rental Agreements for vehicles rented by Justo De La Cruz.  On multiple occasions, investigators have observed members of the above-described DTO operating and riding in those rented vehicles, including BAEZ GUERRERO and ARIAS.

177.   CASTILLO's black BMW sedan, bearing Massachusetts registration 4HKD56, is currently registered to Target Location 2.  During the search of CASTILLO's BMW on August 13, 2024, investigators found an Xfinity bill listing CASTILLO as the account holder, and Target Location 2 as the account address.  The bill showed a due date of June 21, 2024.

*In September and October 2024, Investigators Conducted Three Controlled Purchases of Suspected Narcotics from BAEZ GUERRERO Outside Target Location 2.*

178.   Investigators identified an additional confidential source ("CS-2"), who is not in a position to testify, who knew BAEZ GUERRERO to be a drug trafficker.[24]

---

[23] Leydy Guerrero was the registered owner of the blue 2021 Acura RDX, bearing Massachusetts registration 3KEF19 (the "Acura"), described above.  On April 17, 2024, investigators observed BAEZ GUERRERO enter the Acura after departing Apartment #1158.  On May 30, 2024, investigators observed Tavarez operating the Acura and picking up ALMONTE after he fled from a motor vehicle stop and investigators seized narcotics, described above.

[24] CS-2 has been cooperating with investigators since 2023. CS-2 has a criminal history consisting of larcenies, fraud, and assault charges. Information provided by CS-2 has led to identifications of narcotics traffickers, arrests, and seizures of narcotics. CS-2 has provided information that has been corroborated. Information provided by CS-2 is believed to be reliable.

179.   In September 2024,[25] at investigators' direction, CS-2 contacted BAEZ GUERRERO via WhatsApp on the 8005 Phone.   In lightly coded language, CS-2 requested fentanyl from BAEZ GUERRERO.   BAEZ GUERRERO stated that he was in Maine but would send someone to CS-2 to provide the narcotics.   CS-2 met with investigators and they searched his person for contraband and currency with negative results.   This controlled buy was not recorded. Investigators established surveillance outside the Target Location 2 Building.   At approximately 11:47 a.m., investigators observed two males arrive on a scooter outside the Target Location 2 Building.   One male in a red sweatshirt entered the outer door to the Target Location 2 Building. At approximately 11:49 a.m., the other male in a white shirt entered the outer door to the Target Location 2 Building.   At approximately 11:50 a.m. the male in the red sweatshirt exited the outer door to the Target Location 2 Building.   At approximately 11:51 a.m., BAEZ GUERRERO, using the 8005 Phone, told CS-2 that a runner would meet him at 1151 Blue Hill Avenue, which is two blocks away from the Target Location 2 Building.   At 12:04 p.m., BAEZ GUERRERO contacted CS-2 and told him to meet the runner at 55 Wilcock Street.   At approximately 12:14 p.m., CS-2 arrived in the area of the Target Location 2 Building.   At approximately 12:16 p.m., the male in the red sweatshirt came from the left side of the Target Location 2 Building and met CS-2.   The male provided CS-2 with the suspected narcotics.   The male in the white shirt then picked up the male in the red sweatshirt on the scooter and they both departed the area.   CS-2 met with investigators and turned over the suspected narcotics.   Investigators searched CS-2 for contraband and currency with negative results.   The suspected narcotics were field tested and yielded a positive

---

[25] I have intentionally left off the dates of these controlled purchases in an effort to protect CS-2's identity.

result for fentanyl. Based on experience and training, investigators believe the substance to contain fentanyl.

180.    In the second half of October 2024, in the morning, CS-2 made contact with BAEZ GUERRERO over WhatsApp on the 8005 Phone.   In lightly coded language, CS-2 ordered fentanyl. BAEZ GUERRERO stated that he would send someone to CS-2 to provide the narcotics. CS-2 met with investigators and they searched his person for contraband and currency with negative results.   This controlled buy was not recorded.   Investigators established surveillance outside the Target Location 2 Building.   At approximately 12:16 p.m., BAEZ GUERRERO contacted CS-2 and told CS-2 that the runner would meet CS-2 in approximately four minutes.   At approximately 12:18 p.m., a male wearing a red sweatshirt arrived in the area of the Target Location 2 Building.   The male was driving the 2008 Accord registered to ARIAS.   The male in the red sweatshirt entered the outer door to the Target Location 2 Building.   At approximately 12:25 p.m., BAEZ GUERRERO, using the 8005 Phone, told CS-2 that the runner was ready.   At approximately 12:36 p.m., the male in the red sweatshirt walked down the driveway outside the Target Location 2 Building and toward the street.   At approximately 12:37 p.m., the male in the red sweatshirt met with CS-2 outside the Target Location 2 Building.   The male provided CS-2 with the suspected fentanyl.   CS-2 met with investigators and turned over the suspected fentanyl. Investigators searched CS-2 for contraband and currency with negative results.   The suspected fentanyl was field tested and yielded a positive result for fentanyl.   Based on experience and training, investigators believe the substance to contain fentanyl.

181.    Several days later, in the second half of October 2024, in the morning, CS-2 made contact with BAEZ GUERRERO over WhatsApp on the 8005 Phone.   In lightly coded language, CS-2 ordered fentanyl.   CS-2 met with investigators and they searched his person for contraband

and currency with negative results.  This controlled buy was not recorded.  Investigators established surveillance outside the Target Location 2 Building.  At approximately 1:14 p.m., BAEZ GUERRERO, using the 8005 Phone, told CS-2 that he would call CS-2 back in 10 minutes. From 1:14 p.m. to 2:06 p.m., CS-2 and BAEZ GUERRERO communicated several times and BAEZ GUERRERO provided updates on his progress.  At approximately 2:06 p.m., BAEZ GUERRERO, using the 8005 Phone, told CS-2 that he was ready to meet.  At approximately 2:08 p.m., BAEZ GUERRERO arrived in the area in a vehicle, exited the vehicle, and walked into the front door of the Target Location 2 Building.  At approximately 2:21 p.m., BAEZ GUERRERO exited the Target Location 2 Building and met with CS-2 on the street.  BAEZ GUERRERO provided CS-2 with the suspected narcotics.  At approximately 2:24 p.m., BAEZ GUERRERO went back inside the Target Location 2 Building.  CS-2 met with investigators and turned over the suspected narcotics.  Investigators searched CS-2 for contraband and currency with negative results.  The suspected narcotics were field tested and yielded a positive result for fentanyl.  Based on experience and training, investigators believe the substance to contain fentanyl.

182.    Based on these three controlled purchases, all set up by BAEZ GUERRERO and based outside the Target Location 2 Building, investigators believe that BAEZ GUERRERO is using his residence, Target Location 2, to store narcotics and narcotics proceeds.

### *Drug Traffickers' Use of Residences and Cell Phones Generally*

183.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

a.    Controlled substances and materials used to "cut" or dilute those substances.

69

b.      Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.      Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units.

d.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills.

e.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

f.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.      Labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j.      Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on

70

the phone, call logs, saved text messages, saved usernames and passwords and documents.

184.    Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug business.  I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash locations.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences for longer periods of time than they keep drugs in their residences.

185.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug

trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

186.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

187.    Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

188.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

189.    Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused in their residence for future use. Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to

their suppliers in order to pay for a continuing supply of drugs. Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

190. During the course of searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Charged Offense. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

191. Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. As described above, the Target Subjects used cellular telephones to communicate with the CW and each other to arrange drug purchases and money payments. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone

numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

192. Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

74

193.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

194.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including

their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

195.    Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.    Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.    Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## Conclusion

196.    WHEREFORE, I submit that there is probable cause to believe that the Target

Subjects conspired to distribute and possess with intent to distribute controlled substances, that is

fentanyl, methamphetamine, and cocaine, in violation of Title 21, United States Code, Section 846,

and that evidence of that offense, described more fully in Attachment B, will be found in Target

Locations 1 and 2, described more fully in Attachments A-1 and A-2.

Respectfully submitted,

Andrew Frigon, Special Agent
Drug Enforcement Administration

Sworn via telephone in accordance with Fed R. Crim. P. 4.1 on October ___25___, 2024

Honorable Donald L. Cabell
Chief United States Magistrate Judge

## ATTACHMENT A-1 – Premises to be Searched

Target Location 1: 45 Oakwood Avenue, First Floor Apartment, Lawrence, Massachusetts.  45 Oakwood Avenue is a multi-unit family structure with tan siding.  Target Location 1 is on the first floor of the building.  The building can be accessed by a front exterior entrance on Oakwood Avenue.  Once inside the building, from the front, Target Location 1 can be accessed by an inward opening door immediately on the left side of the entranceway.  The building can also be accessed by a rear entrance on Ferry Street at the top of a short set of stairs leading to an exterior landing. Photos of the exterior of Target Location 1 are below.



**View of the front exterior entrance and the interior entrance to Target Location noted by a yellow arrow.**



**View of the rear entrance noted by a red arrow.**

**ATTACHMENT A-2 – Premises to be Searched**

<u>Target Location 2</u>: 51 Wilcock Street, Apartment 2, Boston, Massachusetts 02124. 51 Wilcock Street is a three-family home with one apartment per floor.  Apartment 2 is on the second floor of the building.  Target Location 2 can be accessed by entering the building's outer front door, walking up a flight of stairs, and entering the apartment through another door on the second floor. Above the main front entry door to the building is the number "51."  The building can also be accessed through a rear outer door.  There is a paved driveway on the left side of the building when viewed from the street.  A photo of the exterior of the building at 51 Wilcock Street are below:



**View from the street**



**View from the side.**

**ATTACHMENT B**

All records and tangible objects in whatever form, from October 11, 2023 to present, that constitute evidence, fruits, or instrumentalities of violations of conspiracy to distribute and possess with intent to distribute controlled substances, that is fentanyl, methamphetamine, and cocaine in violation of Title 21, United States Code, Section 846 (hereinafter, the "Charged Offense"):

1. Controlled substances, including but not limited to fentanyl, crystal or methamphetamine, and materials used to "cut" or dilute those substances.

2. Books, records, receipts, notes, ledgers, and other papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers or relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, photographs, telephone address books; planners; notes; ledgers; prescriptions; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3. Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Items of personal property that tend to identify the person(s) in control, or ownership of the target vehicle. Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

6. Cellular telephones used by any of the Target Subjects and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating

to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c. Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e. GPS data;

f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.